**Aubrey Dennis ADAMS, Jr., Petitioner-Appellant,**

v.

**Richard L. DUGGER, Robert Butterworth, Respondents-Appellees.**

No. 86–3207.

United States Court of Appeals, Eleventh Circuit.

April 23, 1987.

---

Mark E. Olive, David A. Reiser, Office of Capital Collateral Representative, Tallahassee, Fla., Ronald J. Tabak, Skadden, Arps, Slate, Meagher & Flom, New York City, Kenneth M. Hart, Tallahassee, Fla., for petitioner-appellant.

Margene Roper, Asst. Atty. Gen., Dept. of Legal Affairs, Daytona Beach, Fla., Richard B. Martell, Asst. Atty. Gen., for respondents-appellees.

## ON PETITION FOR REHEARING

(Opinion Nov. 13, 1986, 11 Cir., 804 F.2d 1526).

Before RONEY, Chief Judge, FAY and JOHNSON, Circuit Judges.

PER CURIAM:

Part I(A)(2), entitled "Procedural Bar," is hereby vacated and the following is substituted in lieu thereof:

2. Abuse of the Writ and Procedural Bar

A district court need not consider a claim raised for the first time in a second habeas petition, unless the petitioner establishes that the failure to raise the claim earlier was not the result of intentional abandonment or withholding or inexcusable neglect. Rule 9(b) of the Rules Governing Section 2254 Cases in the United States District Courts; *Witt v. Wainwright*, 755 F.2d 1396, 1397 (11th Cir.1985). Consideration of a claim also can be barred by failure to comply with state procedural rules, absent a showing of cause for, and prejudice resulting from, such failure. *Wainwright v. Sykes*, 433 U.S. 72, 87, 97 S.Ct. 2497, 2506, 53 L.Ed.2d 594 (1977); *accord, Engle v. Isaac*, 456 U.S. 107, 110, 102 S.Ct. 1558, 1562, 71 L.Ed.2d 783 (1982).

Because the district court's determination that Adams' failure to raise his *Caldwell* claim, *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), in his first habeas petition and its determination that the claim was procedurally barred both were based on the district

court's erroneous conclusion that *Caldwell* was inapplicable, the district court clearly abused its discretion in finding abuse of the writ and procedural bar on that basis. Further, as discussed below, we find that neither the abuse of the writ doctrine nor procedural bar precludes our consideration of the merits of this claim.

### a. Abuse of the Writ

■ We find no evidence that Adams' failure to raise this claim in his earlier petition was the result of inexcusable neglect or deliberate withholding. The *Caldwell* decision, upon which the claim is based, clearly was not available to Adams at the time he filed his first petition in September 1984. Indeed, the Supreme Court did not grant certiorari in *Caldwell* until after the district court had denied Adams' first petition. *Cf. Bowden v. Kemp*, 793 F.2d 273, 275 & n. 4 (11th Cir.1986) (finding abuse of the writ when previous petition was filed after Supreme Court had granted certiorari in case upon which petitioner relied). Nor is the Eighth Amendment argument raised by Adams in this petition one of which he should have been aware at the time of filing his first petition. This claim is not one which had been raised and considered in a number of other cases at the time of that petition. *Cf. Witt*, 755 F.2d at 1398 (finding abuse of the writ when claim raised in case upon which petitioner relied "had been raised long before [that] case" so that failure to present the claim in his first petition was "necessarily attributable to abandonment or inexcusable neglect").

Nor did Supreme Court precedent at the time of Adams' first habeas petition make it evident that statements such as those made by the trial judge in this case implicated the Eighth Amendment. In fact, if anything, that precedent indicated that the contrary was true. In *California v. Ramos*, 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983), the Supreme Court decision most relevant to Adams' claim before *Caldwell*, the Supreme Court found "no constitutional defect" under the Eighth Amendment in a jury instruction that informed jurors of the California governor's power to commute a life sentence without possibility of parole to a lesser sentence that included the possibility of parole. *Id.* at 994, 103 S.Ct. at 3449. In doing so, the Court rejected petitioner's arguments that such an instruction created an unacceptable level of unreliability in the capital sentencing determination, that it deflected the jury from its task of basing the penalty decision on the character of the defendant and the nature of the offense, and that the instruction was misleading because it did not inform the jury that the governor also could commute a death sentence. *Id.* at 998, 103 S.Ct. at 3451. The Court indicated that, although its previous Eighth Amendment decisions had placed some substantive limits on the particular factors that a capital sentencing jury may consider in determining whether death is appropriate, the principal concern of the Court's Eighth Amendment jurisprudence had been "with the *procedure* by which the State imposes the death sentence [rather] than with the substantive factors the State lays before the jury as a basis for imposing death, once it has been determined that the defendant falls within the category of persons eligible for the death penalty." *Id.* at 999, 103 S.Ct. at 3452 (emphasis in original). Except for the specific substantive limitations imposed by its previous decisions, none of which the Court found were applicable to the jury instruction at issue in *Ramos*, the Court stated that it had "deferred to the State's choice of substantive factors relevant to the penalty determination." *Id.* at 1001, 103 S.Ct. at 3453. Further, in rejecting the contention that the instruction was misleading because of its failure also to inform jurors of the governor's power to commute a death sentence, the Court recognized that an instruction regarding the power to commute a death sentence "may incline [the jury] to approach their sentencing decision with less appreciation for the gravity of their choice," but stated that, given its holding that informing the jury of the commutation power did not implicate the Constitution, the Court's statements should not be read as suggesting that "the Federal Constitution prohibits an instruc-

tion regarding the Governor's power to commute a death sentence." *Id.* at 1011–12 & n. 27, 103 S.Ct. at 3458–59, & n. 27.[1]

▆▆▆ The abuse of the writ doctrine should be "of rare and extraordinary application." *Paprskar v. Estelle,* 612 F.2d 1003, 1007 (5th Cir.), *cert. denied,* 449 U.S. 885, 101 S.Ct. 239, 66 L.Ed.2d 111 (1980).

1. In reaching its decision in *Caldwell,* the Court found it necessary to distinguish *Ramos,* which had been relied upon by the Mississippi Supreme Court in upholding Caldwell's death sentence. *Caldwell,* 105 S.Ct. at 2643. In fact, both the majority and the dissent on the Mississippi Supreme Court had interpreted *Ramos* as "leav[ing] the decision of whether to inform the jury of extraneous matters with the individual states." *Caldwell v. State,* 443 So.2d 806, 816 (Miss.1983), *rev'd in part, Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) (Lee, J., dissenting); *id.* at 813. Their disagreement was over whether there was reversible error as a matter of state law. *See id.* at 816.

2. We note that statements regarding appellate review such as those involved in *Caldwell* had been held to be reversible error as a matter of state law by a number of states. *Caldwell,* 105 S.Ct. at 2642. In fact, several pre-*Furman* cases in Florida held that remarks by the trial judge or the prosecutor regarding appellate review constituted reversible error. *E.g., Pait v. State,* 112 So.2d 380, 383–85 (Fla.1959) (prosecutorial statements regarding appellate review held reversible error); *Blackwell v. State,* 76 Fla. 124, 79 So. 731, 735–36 (1918) (prosecutorial comments regarding appellate review approved by trial judge held reversible error). The mere fact a practice may be condemned as a matter of state law, however, does not indicate that the same practice constitutes an Eighth Amendment violation. As the Supreme Court noted in *Ramos,* "States are free to provide greater protections in their criminal justice system than the Federal Constitution requires." 463 U.S. at 1014, 103 S.Ct. at 3460.

Further, at the time of Adams' first habeas petition, this Circuit had considered the argument that prosecutorial and judicial comment on the appellate process rendered a petitioner's trial fundamentally unfair in violation of the due process clause of the Fourteenth Amendment. *E.g., Corn v. Zant,* 708 F.2d 549, 557 (11th Cir.1983), *cert. denied,* 467 U.S. 1220, 104 S.Ct. 2670, 81 L.Ed.2d 375 (1984) (judge's reference to right of automatic appeal did not render trial fundamentally unfair); *McCorquodale v. Balkcom,* 705 F.2d 1553, 1556 (11th Cir.1983), *rev'd on reh'g en banc on other grounds,* 721 F.2d 1493 (1983), *cert. denied,* 466 U.S. 954, 104 S.Ct. 2161, 80 L.Ed.2d 546 (1984) (prosecutor's remark regarding appellate review did not render trial fundamentally unfair). The fact

We do not find its application warranted with regard to this claim.[2]

## b. Procedural Bar

Adams' *Caldwell* claim was raised for the first time in state court in his second 3.850 motion. The Florida Supreme Court refused to consider the merits of that claim

Adams may have had a basis for raising a due process claim by analogy to these decisions at the time of his first habeas petition, however, does not indicate that his failure to raise the Eighth Amendment claim he now raises was the result of intentional abandonment or inexcusable neglect. It is clear that not every claim that implicates the fundamental fairness standards embodied in the due process clause necessarily implicates the Eighth Amendment as well. Indeed, although both *Corn* and *McCorquodale* were capital cases, neither gives any indication that the Eighth Amendment is implicated by statements regarding appellate review. Both assume that the proper analysis of such a claim is under the fundamental fairness standard of the due process clause as enunciated in *Donnelly v. DeChristoforo,* 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974). The distinction between claims that implicate the fundamental fairness standards embodied in the due process clause and those that implicate the Eighth Amendment has been recognized from the inception of the Supreme Court's modern Eighth Amendment jurisprudence. The year before the Supreme Court held in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), that Georgia's death penalty statute violated the Eighth Amendment, the Court rejected the contention that discretion in imposing the death penalty violated the fundamental fairness standards embodied in the due process clause of the Fourteenth Amendment. *McGautha v. California,* 402 U.S. 183, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971). *See Lockett v. Ohio,* 438 U.S. 586, 599, 98 S.Ct. 2954, 2961, 57 L.Ed.2d 973 (1978) (plurality opinion) ("Thus, what had been approved under the Due Process Clause of the Fourteenth Amendment in *McGautha* became impermissible under the Eighth and Fourteenth Amendments by virtue of the judgment in *Furman.*"). In fact, the three dissenting justices in *Caldwell* argued that the claim involved in that case did not implicate the Eighth Amendment and should have been analyzed instead as a due process claim. Then Justice Rehnquist stated that he found "unconvincing the Court's scramble to identify an independent Eighth Amendment norm that was violated by the statements" in *Caldwell,* and argued that the Court's inquiry should have been the due process inquiry as to "whether the statements rendered the proceedings as a whole fundamentally unfair." 105 S.Ct. at 2650 (Rehnquist, J., dissenting) (joined by Burger, C.J., and White, J.).

because it had not been raised on direct appeal. *Adams v. State*, 484 So.2d 1216, 1217 (Fla.1986).[3] Failure to comply with an independent and adequate state procedural rule ordinarily precludes federal habeas review of a claim, absent a showing of cause for, and prejudice resulting from, the procedural default. *Sykes*, 433 U.S. at 87, 97 S.Ct. at 2506; *Spencer v. Kemp*, 781 F.2d 1458, 1463 (11th Cir.1986) (en banc). It is doubtful, however, that an adequate and independent state law ground is present in this case.

■ Under Florida law, claims based on constitutional changes in the law since the time of a petitioner's direct appeal of sufficient magnitude to warrant retroactive application are cognizable in Rule 3.850 proceedings, *Witt v. State*, 387 So.2d 922, 929 (Fla.), *cert. denied*, 449 U.S. 1067, 101 S.Ct. 796, 66 L.Ed.2d 612 (1980); *Tafero v. State*, 459 So.2d 1034, 1035 (Fla.1984) (finding *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), a change in law cognizable in post-conviction proceedings); *Edwards v. State*, 393 So.2d 597, 600 n. 4 (Fla.App.), *petition denied*, 402 So.2d 613 (Fla.1981) (finding *Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), a change in law cognizable in post-conviction proceedings), as are claims involving fundamental errors, despite the failure to raise such claims on direct appeal. *E.g., Palmes v. Wainwright*, 460 So.2d 362, 365 (Fla.1984) (suppression of evidence is fundamental error cognizable in collateral proceedings); *Nova v. State*, 439 So.2d 255, 261 (Fla.App.1983) (infringement of right to jury trial held fundamental error); *Reynolds v. State*, 429 So.2d 1331, 1333 (Fla.App.1983) (sentencing error that could cause defendant to be incarcerated for greater length of time than provided by law is fundamental and "petitioner is entitled to relief in any and every legal manner possible"). In fact, Adams' *Caldwell* claim

is the very type of claim for which Florida created the Rule 3.850 procedure. *See Witt*, 387 So.2d at 927 (genesis of Rule 3.850 procedure was Florida's desire to provide a mechanism for petitioners to raise challenges based on major constitutional changes in the law "where unfairness was so fundamental in either process or substance that the doctrine of finality had to be set aside"). Therefore, the Florida Supreme Court's holding that Adams' *Caldwell* claim is barred for failure to raise it on direct appeal either must rest on an incorrect determination as to the applicability of *Caldwell*, or represents application of a procedural bar with regard to a type of claim that Florida does not regularly and consistently bar. *See Ake v. Oklahoma*, 470 U.S. 68, 74–75, 105 S.Ct. 1087, 1092–93, 84 L.Ed.2d 53 (1985) (when application of state procedural bar depends on an antecedent ruling as to whether federal constitutional error has been committed there is no independent and adequate state law ground); *Spencer*, 781 F.2d at 1470 (state procedural rule that is sporadically applied is not independent and adequate state ground).

■ Further, we find that Adams has established cause and prejudice for any procedural default resulting from his failure to raise this claim on direct appeal. When "a constitutional claim is so novel that its legal basis is not reasonably available to counsel" at the time of a petitioner's procedural default, the petitioner has cause for the failure to raise the claim in accordance with the state procedural rule. *Reed v. Ross*, 468 U.S. 1, 16, 104 S.Ct. 2901, 2910, 82 L.Ed.2d 1 (1984). Conversely, when the "tools to construct [a] constitutional claim" are available, then the claim is not sufficiently novel to constitute cause for failure to comply with state procedural rules because "[w]here the basis of a constitutional claim is available, and other de-

---

3. The state asserts that the Supreme Court held this claim barred *both* because of Adams' failure to raise it on direct appeal and because Adams' failure to raise it in his first 3.850 motion constituted an abuse of the 3.850 procedure. This interpretation of the Florida Supreme Court's decision is not supported by the language of

that opinion. That language makes it clear that the Florida Supreme Court applied abuse of the 3.850 procedure to bar claims that "ha[d] been considered and ruled upon in the previous motion for post-conviction relief." 484 So.2d at 1217. Adams' *Caldwell* claim was not raised in his prior 3.850 motion.

fense counsel have perceived and litigated that claim, the demands of comity and finality counsel against labeling alleged unawareness of the objection as cause for a procedural default." *Engle*, 456 U.S. at 133–34, 102 S.Ct. at 1574–75. "[T]he question is not whether subsequent legal developments have made counsel's task easier, but whether at the time of the default the claim was 'available' at all." *Smith v. Murray,* —— U.S. ——, 106 S.Ct. 2661, 2667, 91 L.Ed.2d 434 (1986). Because we find that Adams' *Caldwell* claim was so novel at the time of Adams' trial in October 1978 and his sentencing and appeal in early 1979 that its legal basis was not reasonably available at that time, we find that Adams has established cause for any procedural default.

The Supreme Court's decision in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), "drastically altered the constitutional framework in which a citizen in this country can be executed." *Ford v. Strickland,* 734 F.2d 538, 539 (11th Cir.), *aff'd sub nom. Wainwright v. Ford,* 467 U.S. 1220, 104 S.Ct. 3498, 82 L.Ed.2d 911 (1984). In the wake of that decision, the states were required to reevaluate and revise their death penalty statutes. Thus, in a very real sense, *Furman* is a watershed in Eighth Amendment jurisprudence. *Furman* itself, however, "engendered confusion as to what was required in order to impose the death penalty in accord with the Eighth Amendment." *Lockett v. Ohio,* 438 U.S. 586, 599, 98 S.Ct. 2954, 2961, 57 L.Ed.2d 973 (1978) (plurality opinion).

Between the time Florida enacted its new death penalty statute in late 1972 in an attempt to comply with the Eighth Amendment requirements of *Furman* and the time of Adams' trial and sentencing, the Supreme Court had issued several decisions that began to give some shape to the Eighth Amendment concerns expressed in *Furman.* In *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976),

and its companion cases,[4] the Supreme Court considered Eighth Amendment issues posed by five of the post-*Furman* death penalty statutes. The Court's principal concern in these cases, however, was "more with the *procedure* by which the State imposes the death sentence than with the substantive factors the State lays before the jury as a basis for imposing death, once it has been determined that the defendant falls within the category of persons eligible for the death penalty." *Ramos,* 463 U.S. at 999, 103 S.Ct. at 3452 (emphasis in original). Thus, *Gregg* "did not undertake to dictate to the State the particular *substantive* factors that should be deemed relevant to the capital sentencing decision," stating instead that "'the problem [of channeling jury discretion] will be alleviated if the jury is given guidance regarding the factors about the crime and the defendant *that the State, representing organized society, deems particularly relevant to the sentencing decision.'*" *Ramos,* 463 U.S. at 999–1000, 103 S.Ct. at 3452–53 (quoting *Gregg,* 428 U.S. at 192, 96 S.Ct. at 2934) (brackets in original) (emphasis in original).

By the time of Adams' trial, however, the Supreme Court had placed some substantive limitations on the factors that a capital sentencing jury could consider in determining whether death was appropriate:

> In *Gregg* itself the joint opinion suggested that excessively vague sentencing standards might lead to the arbitrary and capricious sentencing patterns condemned in *Furman.* 428 U.S. at 195 n. 46 [96 S.Ct. at 2935 n. 46]. Moreover, in *Woodson v. North Carolina,* 428 U.S. 280 [96 S.Ct. 2978, 49 L.Ed.2d 944] (1976), the plurality concluded that a State must structure its capital sentencing procedure to permit consideration of the *individual* characteristics of the offender and his crime. This principle of individualization was extended in *Lockett v. Ohio,* 438 U.S. 586 [98 S.Ct. 2954, 57

---

**4.** *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); *Woodson v. North Carolina,* 428 U.S. 280, 96

S.Ct. 2978, 49 L.Ed.2d 944 (1976); *Roberts v. Louisiana,* 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976).

L.Ed.2d 973] (1978), where the plurality determined that "the Eighth and Fourteenth Amendments require that the sentencer [in a capital case] not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." Finally, in *Gardner v. Florida*, 430 U.S. 349 [97 S.Ct. 1197, 51 L.Ed.2d 393] (1977), a plurality of the Court held that a death sentence may not be imposed on the basis of a presentence investigation report containing information that the defendant has had no opportunity to explain or deny.

*Ramos*, 463 U.S. at 1000–01, 103 S.Ct. at 3452–53 (brackets in original) (emphasis in original) (footnotes omitted). Beyond these limitations, however, the Court's Eighth Amendment jurisprudence "deferred to the State's choice of substantive factors relevant to the penalty determination." *Id.* at 1001, 103 S.Ct. at 3453. None of these cases indicated that prosecutorial comments or statements by a trial judge to the jury, other than those that limited the mitigating factors that could be considered, implicated the Eighth Amendment prohibition against cruel and unusual punishment.

Further, critical to the Court's analysis in *Caldwell* is its conclusion that "[i]n the capital sentencing context there are specific reasons to fear substantial unreliability as well as bias in favor of death sentences when there are state-induced suggestions that the sentencing jury may shift its sense of responsibility to an appellate court." *Caldwell*, 105 S.Ct. at 2640. As discussed below, much of the *Caldwell* Court's ratio-

nale for this conclusion applies with equal force to the danger of bias in favor of the death penalty from statements such as those made by the trial judge in this case. At the time of Adams' procedural default, however, Supreme Court comment on the effect that a Florida jury's awareness of its advisory role would have on its sentencing decision indicated that a diminished sense of responsibility on its part would incline it towards leniency rather than towards imposition of the death penalty. In *Dobbert v. Florida*, the Court rejected an ex post facto challenge to application of the new Florida death penalty statute to a crime occurring before its enactment, finding the change in the Florida law to be both procedural and ameliorative. 432 U.S. 282, 294, 97 S.Ct. 2290, 2298, 53 L.Ed.2d 344 (1977). The Court found the petitioner's argument that the jury would have recommended life under the old death penalty statute, as it had under the new, unpersuasive because "the jury's recommendation may have been affected by the fact that the members of the jury were not the final arbiters of life or death" and "may have chosen leniency when they knew that that decision rested ultimately on the shoulders of the trial judge, but might not have followed the same course if their vote were final." *Id.* at 294 & n. 7, 97 S.Ct. at 2298 & n. 7.[5]

Our conclusion that Eighth Amendment jurisprudence at the time of Adams' procedural default did not provide a reasonable basis for the claim he now makes is supported by the fact that the state has not cited to, nor have we found, any decisions indicating that this type of Eighth Amendment claim was being raised at that time.[6] In *Engle*, as evidence of the reasonable-

**5.** Indeed, the dissent in *Caldwell* describes as "conjecture" the majority's determination that "the jury would ... have 'delegated' its responsibility by erring in favor of imposing the death penalty." *Caldwell*, 105 S.Ct. at 2650 (Rehnquist, J., dissenting).

**6.** The state argues that pre-*Furman* cases in Florida holding that remarks by the trial judge and the prosecutor regarding appellate review constituted reversible error as a matter of state law provided a reasonable basis for Adams' Eighth Amendment claim. As we indicated in connection with our discussion of abuse of the

writ, *see* note 2, *supra*, the mere fact a practice may be condemned as a matter of state law does not indicate that it also constitutes an Eighth Amendment violation. Similarly, despite the state's argument to the contrary, the *Tedder* decision, *Tedder v. State*, 322 S.2d 908 (Fla. 1975) itself clearly did not provide a reasonable basis for raising this claim, as *Tedder* dealt only with the weight to be given the jury's recommended sentence and not with the Eighth Amendment implications of statements that diminish the jury's sense of responsibility for its sentence.

ness of the legal basis for raising the *Mullaney* issue involved in that case at the time of the petitioner's procedural default, the Court "emphasized that 'dozens of defendants relied upon [*In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368] to challenge the constitutionality of rules [similar to that petitioner was challenging in *Engle* ]' " and that numerous courts had agreed with these arguments. *Reed*, 468 U.S. at 19–20, 104 S.Ct. at 2912–13 (quoting *Engle*, 456 U.S. at 131–32, 102 S.Ct. at 1573–74). The *Reed* Court found the fact similar challenges were not being made and considered at the time the petitioner in *Reed* defaulted with regard to that same issue a "crucial respect" distinguishing the conclusion in *Reed* that there was no reasonable basis for raising the *Mullaney* issue at the time of the procedural default in *Reed* from the *Engle* Court's conclusion that a reasonable basis was present. *Id.*[7]

In this case, as in *Reed*, claims similar to Adams' were not being raised at the time

of his failure to raise this issue, despite the state's assertion that this Court's decision in this case will affect numerous cases already litigated in Florida and despite the number of *Caldwell* claims now being presented to this Court. As the Court noted in *Engle*, the fact a reasonable basis exists for a claim does not mean that every competent lawyer necessarily will raise that claim. 456 U.S. at 133–34, 102 S.Ct. at 1574–75. However, the fact no one was raising the claim Adams now raises at the time of his trial and appeal certainly is an indication that the claim was so novel as to have no reasonable basis in existing precedent.

■ Because the legal basis for Adams' *Caldwell* claim was not reasonably available to him at the time of his trial in October 1978 and his sentencing and appeal in 1979, we find that he has established cause for his failure to raise that claim on direct appeal.[8] Further, Adams also was

7. The *Reed* Court did note that some authority on analogous issues did exist at the time of the petitioner's default in that case. The Court found, however, that because these cases provided only indirect support for the petitioner's claim and because they were the only cases that would have supported the claim at all, it could not conclude that they provided a reasonable basis upon which the petitioner "could have realistically appealed his conviction." 468 U.S. at 18–19, 104 S.Ct. at 2911–12.

8. In *Reed*, the Supreme Court recognized that "whether an attorney has a 'reasonable basis' upon which to develop a legal theory may arise in a variety of contexts" and, therefore, did not attempt to delineate those situations. 468 U.S. at 17, 104 S.Ct. at 2910–11. Instead, it confined its analysis to the specific situation presented in *Reed:* "one in which th[e Supreme] Court has articulated a constitutional principle that had not been previously recognized but which is held to have retroactive application." *Id.* In analyzing the *Mullaney* claim at issue in *Reed*, the Court discussed three situations that the Court previously had identified in the retroactivity context as times when a new constitutional rule representing a "clear break with the past" might emerge from the Supreme Court: (1) a Supreme Court decision might overrule prior Supreme Court precedent, (2) a decision might " 'overtur[n] a longstanding and widespread practice to which [the Supreme Court] has not spoken, but which a near-unanimous body of lower court authority has expressly approved,' " and (3) a decision might " 'disapprov[e] a practice th[e] Court arguably has sanctioned in prior

cases.' " *Id.* (quoting *United States v. Johnson*, 457 U.S. 537, 549, 551, 102 S.Ct. 2579, 2586, 2587, 73 L.Ed.2d 202 (1982)). The *Reed* Court, however, did not state that these situations were the exclusive means by which a petitioner could establish that there was no reasonable basis for his claim at the time of his procedural default. Indeed, as discussed above, the Court clearly recognized that a number of situations could give rise to "cause" based on lack of a reasonable basis for a claim.

There are significant differences between Adams' *Caldwell* claim and the *Mullaney* claim at issue in *Reed* which suggest that the present situation is not sufficiently like that involved in *Reed* to warrant an analysis in terms of the three situations discussed in *Reed* as constituting a "clear break with the past." The *Mullaney* claim at issue in *Reed* was a due process claim and, therefore, could be analyzed in terms of a long history of consideration by the Supreme Court as well as the lower courts. Adams' Eighth Amendment claim, however, involves an area of law that has no similar "past." The Supreme Court's decision in *Furman* was only six years old at the time of Adams' trial and the statute under which he was sentenced, as well as all modern death penalty statutes, had a similarly brief history. The *Reed* Court's analysis of the *Mullaney* issue before it thus assumes a past in the form of a long decisional history that simply is not present in the Eighth Amendment context. It is in fact this lack of any past decisional history indicating that the issues raised by Adams' *Caldwell* claim were even ad-

prejudiced by the failure to raise this claim. As discussed below, the judge's statements to Adams' jury clearly violated the principles enunciated in *Caldwell*, thereby creating an impermissible danger that the jury's recommended sentence was unreliable and, consequently, that Adams' death sentence was unreliable.[9]

With the above modification of the previously published opinion, the Petition for Rehearing is DENIED.

dressed by the Eighth Amendment that gives rise to "cause" in this case.

Nevertheless, even assuming that our analysis should proceed in terms of the three situations outlined in *Reed*, the clear indication of the Eighth Amendment decisions at the time of Adams' trial and appeal that the primary concern of the Eighth Amendment was with the procedures by which the death penalty was imposed, rather than with the particular substantive factors considered by the jury in reaching its decision, and the suggestion by the Supreme Court in *Dobbert* that statements to a Florida jury that they were not the final arbiter of life and death would bias them in favor of leniency rather than death, certainly can be said to have "arguably sanctioned" statements such as those made by Adams' trial judge for purposes of their consistency with the requirements of the Eighth Amendment.

9. The state argues that prejudice cannot be demonstrated because (1) the judge's comments were a correct assessment of Florida law, (2) the judge's instructions to the jury as to aggravating and mitigating factors and their weighing would make it clear the jury should render its advisory sentence on the individual circumstances of the case and (3) the comments were made during voir dire, when the judge was merely trying to give the prospective jurors some sense of the sentencing structure.

As discussed above, however, the judge's comments were misleading because they left the jury with a false impression as to the significance of its role in the sentencing process. Further, the judge's instructions regarding mitigating and aggravating circumstances did not cure the misleading statements, because there was no withdrawal or correction of those statements. *Cf. Caldwell*, 105 S.Ct. at 2645 n. 7 (prosecutor's later statements that jury played important role did not cure misleading statements because prosecutor did not retract or undermine those statements). Although the trial judge instructed the jury during the penalty phase not to "act hastily or without due regard to the gravity of these proceedings" and told it to "carefully weigh, sift and consider the evidence, and all of it, realizing that human life is at stake," nothing he said corrected the misunderstanding as to the significance of the jury's recommendation engendered by his earlier statements. In fact, at the beginning of the penalty phase, the judge reinforced his prior comments by stating that "the final decision as to what punishment shall be imposed rests solely upon the Judge of this Court." He also made a similar remark at the beginning of the penalty phase jury instructions. Further, the fact the jury heard these statements during voir dire does not mean that the statements did not influence the jury. These statements were not isolated, insignificant comments. They were made by the judge at a time when he purportedly was informing the prospective jurors as to their role in the trial, the statements were made repeatedly, and the judge informed the prospective jurors that the substance of these statements was "the most important thing to remember in Phase Two."