[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 490 
James Lewis Martin, Jr., was convicted for the robbery-murder of Allen Powell, a capital offense under Alabama Code 1975, § 13A-5-40(a)(2), and was sentenced to death. Ten issues are raised on this appeal from that conviction.
 I
Martin argues that the trial judge erred in granting the prosecution's challenges for cause to two venire members based upon their views on capital punishment. We disagree.
Our review of the record convinces us that the following is a fair and representative statement of venire member Lewis J. Stewart's expressed views on capital punishment: "Even though I don't think it is wrong, I don't think I could actually say this person should be put to death. * * * I personally believe there are times when a death penalty case should be imposed, yes. Personally myself saying that this person should be put to death, I couldn't do it. I don't believe I could."
The views of venire member Roxy C. Bethea on the death penalty are summarized in her response, "I'm not sure. I don't know. I'm stuck on that one. I'm really not sure. If the circumstances — I guess I don't know."
The proper standard for determining whether a prospective juror may be excluded for cause because of his or her views on capital punishment is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' "Wainwright v. Witt, 469 U.S. 412, 105 S.Ct. 844, 852,83 L.Ed.2d 841 (1985); Gray v. Mississippi, 481 U.S. 648,107 S.Ct. 2045, 2051, 95 L.Ed.2d 622 (1987). "The crucial inquiry is whether the venireman could follow the court's instructions and obey his oath, notwithstanding his views on capital punishment." Dutton v. Brown, 812 F.2d 593, 595 (10th Cir.), cert. denied, Dutton v. Maynard, 484 U.S. 836, 108 S.Ct. 116,98 L.Ed.2d 74 (1987). A juror's bias need not be proved with "unmistakable clarity" because "juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism." Id.
A trial judge's finding on whether or not a particular juror is biased "is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province." Witt, 469 U.S. at 429, 105 S.Ct. at 855. That finding must be accorded proper deference on appeal. Id. "A trial court's rulings on challenges for cause based on bias [are] entitled to great weight and will not be disturbed on appeal unless clearly shown to be an abuse of discretion."Nobis v. State, 401 So.2d 191, 198 *Page 491 
(Ala.Cr.App.), cert. denied, Ex parte Nobis, 401 So.2d 204 (Ala. 1981).
 II
Martin contends that the trial judge erred in refusing to grant his challenge for cause as to prospective juror Dora Stewart. Mrs. Stewart testified that she believed the death penalty was "right" and that "it should be given if you take someone else's life." She stated that she would always vote for death rather than life without parole. However, because Mrs. Stewart later stated that she could and would follow the court's instructions, the challenge for cause was properly denied.
A venire member who believes that the death penalty should automatically be imposed in every capital case should be excused. Bracewell v. State, 506 So.2d 354, 358 (Ala.Cr.App. 1986). Persons who favor the death penalty should not be excused for cause where they indicate they will follow the court's instructions. Hance v. Zant, 696 F.2d 940, 956 (11th Cir.), cert. denied, 463 U.S. 1210, 103 S.Ct. 3544,77 L.Ed.2d 1393 (1983).
 III
Venire member Roger Norris testified that he heard that Martin had confessed. Norris initially stated, "I know I will not be able to forget it. It will affect my opinion." Although he consistently expressed his reservations about "hav[ing] a hard time wiping that out of [his] mind," after questioning by the trial court he stated that he "would try to the best of [his] ability" to consider only what the court instructed him to consider.
A juror is not disqualified where he testifies on voir dire that he has an opinion which might bias his verdict, but that he could try the case and render a verdict according to the evidence. Strickland v. State, 151 Ala. 31, 44 So. 90, 92
(1907). See also Berard v. State, 486 So.2d 458, 461-62
(Ala.Cr.App. 1984), reversed on other grounds, 486 So.2d 476
(Ala. 1986); Beck v. State, 485 So.2d 1203, 1205 (Ala.Cr.App. 1984), affirmed, Ex parte Beck, 485 So.2d 1207 (Ala. 1985). See also Ex parte Grayson, 479 So.2d 76, 80 (Ala.), cert. denied,Grayson v. Alabama, 474 U.S. 865, 106 S.Ct. 189, 88 L.Ed.2d 157
(1985).
 IV
In instructing the jury on the element of "reasonable doubt," the trial court charged that "[t]he doubt which would justify an acquittal must be an actual and substantial doubt" and that "[it] is not a fanciful, vague, conjectural or speculative doubt, but a reasonably substantial doubt arising from the evidence." In Williams v. State, 455 So.2d 210, 212
(Ala.Cr.App. 1984), this Court explained that, while such an instruction may be subject to criticism, it does not constitute error. See also Baker v. State, 477 So.2d 496, 502-03
(Ala.Cr.App. 1985), cert. denied, Baker v. Alabama,475 U.S. 1029, 106 S.Ct. 1231, 89 L.Ed.2d 340 (1986).
 V
On cross-examination of prosecution witness Robert Elliott, defense counsel asked, "Mr. Elliott, don't you have a problem with mind-altering drugs?" The trial court properly sustained the prosecutor's objection. Defense counsel's offer of proof showed that Elliott had used drugs, including marijuana, LSD, cocaine, and valium, extensively for a substantial period of time but that he had quit approximately three years before the defendant's trial and approximately two years before the events as to which he was testifying.
 "A witness' addiction to a narcotic drug is not admissible to impeach him unless one of the following [is] shown: (1) that he is under the influence of the drug at the time of his testifying, (2) that he was under the influence of the drug at the time of the event of which he testifies or (3) that his mind is generally impaired by the habitual use of narcotic drugs." C. Gamble, McElroy's Alabama Evidence, § 141.01(3) (3rd ed. 1977).
See also Luker v. State, 361 So.2d 1124, 1126 (Ala.Cr.App.), cert. dismissed, Luker v. State, 361 So.2d 1127 (Ala. 1978). "Most courts which have specifically decided or *Page 492 
discussed this issue appear to take the view that evidence of drug use proffered to show lack of veracity is inadmissible." Annot., 65 A.L.R.3d 705, 713 (1975).
 VI
The defendant argues that the State failed to present a prima facie case of the capital robbery-murder charged because there was no evidence that the defendant intentionally killed the victim.
"[N]o defendant is guilty of a capital offense unless he had an intent to kill." Beck v. State, 396 So.2d 645, 662 (Ala. 1981); Lewis v. State, 456 So.2d 413, 416 (Ala.Cr.App. 1984); Alabama Code 1975, § 13A-5-40(b)(c).
In compliance with § 13A-5-47(d), the trial court entered written findings of fact summarizing the crime and the defendant's participation in it:
 "From the evidence, both testimonial and from physical exhibits, the Court states the following factual circumstances of the instant case.
 "On Wednesday, May 29, 1985, in the early evening hours, Allen Powell and Kathleen Ellison, both employees at Jack Ingram Motors, met at a parking lot on the campus of Auburn University at Montgomery. Their reported purpose in meeting was so that Ms. Ellison could test drive a Datsun 300 ZX that her husband was considering purchasing. From there, the two drove the car on a route that eventually led them to a sparsely developed subdivision known as Timberlane off of Vaughn Road in Montgomery County. The couple parked the car, according to Ms. Ellison, so that Mr. Powell could exchange places with Ms. Ellison who had been driving up to that point. As they sat there and while Mr. Powell explained the various features and instrumentation on the car, two white males approached the car on foot. "Ms. Ellison testified that the two were wearing blue jeans, ball caps and were shirtless. One was carrying a rifle by his side. They positioned themselves on the driver's side of the car, the one with the rifle toward the front and the other toward the rear. Testimony revealed that the individual with the rifle asked Powell, 'Where are you going?' Mr. Powell responded, 'We are leaving,' to which the individual with the weapon countered 'No, you are not.' When Mr. Powell attempted to crank the car and drive off, the individual with the rifle raised it and pointed it at the couple in the car. The individual at the rear of the auto was heard to say at that point, 'Don't do it.'
 "As Mr. Powell began to drive off, he was shot once through the upper left arm. The bullet traveled through his arm and into the chest area, causing a mortal wound. After traveling a short distance, and while the car was still in motion, Mr. Powell lost consciousness and slumped over the steering wheel. Ms. Ellison was able to stop the auto by applying the emergency brake. The car had travelled approximately 150 yards from the point of the assault.
 "Between the point that Mr. Powell was shot, and the point that the car was stopped, another shot was fired but struck neither the car nor the occupants. "Ms. Ellison exited the car, proceeded to the driver's side and attempted to move Mr. Powell over. After being unsuccessful, she pulled him from the automobile laying him on his back in the roadway. She then drove off in order to seek assistance.
 "John Sims and his family reside at 915 Timberlane Drive. In the late afternoon of May 29, 1985, he was at home and was working in his yard. As he worked, he noticed that two white males made several passes by his house in a gold or brown colored old Chevrolet Impala with a loud muffler. At trial he identified one of those subjects as being the Defendant. After the car passed his house for the last time, he heard it continue on around the subdivision, then stop. It wasn't long after that that he heard two shots.
 "Another witness testified that he was a neighbor of Mr. Sims and on the date in question had seen an older model gold or brown Chevrolet Impala occupied by two white males in the neighborhood. *Page 493 
 "Ms. Ellison found the Sims' residence and sought assistance from Mr. Sims. After calling the authorities, Mr. Sims took Ms. Ellison back to the body of Mr. Powell. Upon arrival, Ms. Ellison noticed that Mr. Powell's body had been moved in that it was now positioned on its side. Fearful that the men may still be present, Mr. Sims took Ms. Ellison back to his residence where another neighbor had arrived to offer assistance. "Shortly after returning to Mr. Powell's body, Mr. Sims was joined by the authorities. Upon investigation, it was determined that Mr. Powell's billfold had been removed. Some of his personal papers were found strewn around his body. In the course of the investigation other contents of the billfold were found along a county road where they presumably had been thrown by the assailants.
 "Ms. Ellison could not identify either of the assailants.
 "The weapon used in the shooting was a 30-30 rifle. It had been stolen some weeks prior to May 29, 1985. The owner of the rifle made a positive identification at trial and the fact that it was the murder weapon was established through the testimony of a ballistics expert. The owner testified that the rifle had been taken during the course of a burglary, and at the time, it had a removable scope mounted on it. A scope that was recovered from the residence where the Defendant lived at the time of the shooting was introduced at trial and positively identified by its owner as being the same one that was mounted to the murder weapon at the time it was stolen. The rifle was not recovered at that residence; and at the time that it was found, it was not in the possession of the Defendant. "Prior to May 29, 1985, the Defendant had purchased a gold colored 1967 Chevrolet Impala. Photographs of the car were introduced at trial and were exhibited to John Sims and the other witness who had testified as to the car they had seen in the neighborhood on the afternoon of the shooting.
 "Subsequent to May 29, 1985, the Defendant was incarcerated in the Montgomery County Jail on an unrelated charge. At that time he was also under investigation for the Powell slaying. While in jail, he stated to a fellow inmate that he had shot Mr. Powell but that it was an accident. The testimony of that inmate was introduced as evidence during the course of the trial."
"[T]he law infers from the use of a deadly weapon an intent to kill or to do grievous bodily harm. A killing done with a deadly weapon is presumed to have been done maliciously."Fulghum v. State, 291 Ala. 71, 76, 277 So.2d 886 (1973).
Here, the issue of intent was properly submitted to the jury:
 "The use of a deadly weapon, under proper circumstances, gives rise to the permissible legal presumption of both malice and intent. Douglas [v. State], supra [, 42 Ala. App. 314, 163 So.2d 477
(1963)]. These legal presumptions are rebuttable, however, and if the evidence which proves the offense would permit an inference that the defendant acted without the requisite intent or malice, then the rebuttable nature of these presumptions must be submitted to the jury." Ex parte Bayne, 375 So.2d 1239, 1244 (Ala. 1979).
See also Harrell v. State, 470 So.2d 1303, 1307 (Ala.Cr.App. 1984), affirmed, Ex parte Harrell, 470 So.2d 1309 (Ala.), cert. denied, Harrell v. Alabama, 474 U.S. 935, 106 S.Ct. 269,88 L.Ed.2d 276 (1985) (capital case where defendant testified shooting was accidental). Intent is usually a question for the jury. Page v. State, 487 So.2d 999, 1007 (Ala.Cr.App. 1986).
 VII
The defendant requested the following jury charge:
 "You are to assume that if James Martin is sentenced to life imprisonment without the possibility of parole, he will spend the rest of his life in prison. Likewise, you are to presume that if James Martin is sentenced to death he will be executed.
"You are to make no other presumptions." *Page 494 
The refusal of this charge was not error. Williams v. State,461 So.2d 834, 847 (Ala.Cr.App. 1983), reversed on other grounds, Ex parte Williams, 461 So.2d 852 (Ala. 1984), followed in Morrison v. State, 500 So.2d 36, 47-48 (Ala.Cr.App. 1985), affirmed, Ex parte Morrison, 500 So.2d 57 (Ala. 1986), cert. denied, Morrison v. Alabama, 481 U.S. 1007, 107 S.Ct. 1634,95 L.Ed.2d 207 (1987). See also O'Bryan v. Estelle, 714 F.2d 365,388-89 (5th Cir. 1983), cert. denied, 465 U.S. 1013,104 S.Ct. 1015, 79 L.Ed.2d 245 (1984).
 VIII
The defendant requested the following jury instruction:
 "If you are unable to reach a decision for either life without the possibility of parole or death by electrocution, then you have the further option of declaring that you are hopelessly deadlocked and cannot reach a verdict. Declaring yourselves to be deadlocked and unable to reach a verdict will not affect the capital murder conviction you have already returned."
The refusal of this instruction was proper. Whisenhant v.State, 482 So.2d 1225, 1236 (Ala.Cr.App. 1982), affirmed, Exparte Whisenhant, 482 So.2d 1241, 1245 (Ala. 1983).
California v. Ramos, 463 U.S. 992, 103 S.Ct. 3446,77 L.Ed.2d 1171 (1983), does not compel a different result. In that case, the Supreme Court concluded that "a capital sentencing jury's consideration of the Governor's power to commute a life sentence is not prohibited by the Federal Constitution." 463 U.S. at 1010, 103 S.Ct. at 3458. However, the Court did not hold that a capital sentencing jury must be instructed that a sentence of life without parole could be commuted: "Our conclusion is not intended to override the contrary judgment of state legislatures that capital sentencing juries in their States should not be permitted to consider the Governor's power to commute a sentence. . . . [T]he wisdom of the decision to permit juror consideration of possible commutation is best left to the States." 463 U.S. at 1013-14, 103 S.Ct. at 3460.
 IX
Under Caldwell v. Mississippi, 472 U.S. 320, 105 S.Ct. 2633,2639, 86 L.Ed.2d 231 (1985), "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." However, the comments of the prosecutor and the instructions of the trial court accurately informing a jury of the extent of its sentencing authority and that its sentence verdict was "advisory" and a "recommendation" and that the trial court would make the final decision as to sentence does not violate Caldwell. "[C]omments which accurately explain the respective functions of the Judge and jury are permissible under Caldwell 'as long as the significance of [the jury's] recommendation is adequately stressed.' " Harich v. Wainwright, 813 F.2d 1082, 1101 (11th Cir. 1987). Here, neither the prosecutor nor the trial court misrepresented the effect of the jury's sentencing recommendation. The cases of Caldwell, supra; Mann v. Dugger,817 F.2d 1471 (11th Cir.), vacated, 828 F.2d 1498 (1987); Adamsv. Wainwright, 804 F.2d 1526 (11th Cir. 1986), modified, Adamsv. Dugger, 816 F.2d 1493 (11th Cir. 1987); andHarich, supra, each involved a situation where the prosecutor and the trial court misled the jury as to its critical role in sentencing under state law. In Hooks v. State, 534 So.2d 329
(Ala.Cr.App. 1987), this Court reviewed the decisions of other jurisdictions which have confronted this issue and concluded: "The trial judge's and the prosecutor's remarks clearly defined the jury's role in the sentencing scheme. Thus, the jury could not have been confused as to its responsibility in the sentencing process. The remarks made here were a correct statement of the law and did not tend to mislead or misinform the jury. Therefore, we conclude the remarks were not improper under Caldwell, supra."
 X
The defendant contends that several comments by the prosecutor during his *Page 495 
closing argument in the penalty phase of the trial constitute reversible error.
On four occasions during his rebuttal argument, the prosecutor urged the jury to "do your duty" and to recommend a sentence of death. On no occasion was there any objection or request for curative instructions.
United States v. Young, 470 U.S. 1, 105 S.Ct. 1038, 1048,84 L.Ed.2d 1 (1985), noted, among other things, that "[t]he prosecutor was also in error to try to exhort the jury to 'do its job'; that kind of pressure, whether by the prosecutor or defense counsel, has no place in the administration of criminal justice," but held that, given its context, the prosecutor's error did not require reversal. In his separate opinion Justice Brennan, though he disagreed with the majority's disposition of the case, agreed that this conduct was error; he noted, "Many courts historically have viewed such warnings about not 'doing your job' as among the most egregious forms of prosecutorial misconduct. See, e.g., Annot., 85 A.L.R.2d 1132 (1962 and Supp. 1979)." 470 U.S. at 30, 105 S.Ct. at 1054.
In the initial closing argument, the prosecutor did not urge the jury to do its duty. In reply to the prosecutor's initial closing argument, defense counsel told the jury that its "job" was to decide life or death and reminded the jury of the "enormity of the job that you have to do"; that "[i]t's not your job, . . . to do what the community would want done necessarily. It's not your job to feel that pressure. It's your job to do what you must do as individual jurors in this particular case."
While we find that the prosecutor's argument was improper, we do not find that it constitutes plain error under the circumstances of this case. These remarks do not constitute plain error because, "[v]iewed in context, the prosecutor's statements, although inappropriate and amounting to error, were not such as to undermine the fundamental fairness of the trial and contribute to a miscarriage of justice." Young, 105 S.Ct. at 1047. Ex parte Harrell, 470 So.2d 1309, 1313 (Ala.), cert. denied, 474 U.S. 935, 106 S.Ct. 269, 88 L.Ed.2d 276 (1985). "While [a] failure to object does not preclude review in a capital case, it does weigh against any claim of prejudice." Exparte Kennedy, 472 So.2d 1106, 1111 (Ala.), cert. denied,Kennedy v. Alabama, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325
(1985) (emphasis in original).
 XI
In compliance with the requirements of Alabama Code 1975, § 13A-5-53, we have reviewed the entire record, including both the guilt and the sentence proceedings, for any error adversely affecting the rights of the defendant and have found none.
The trial court found the existence of three aggravating circumstances: (1) "The capital offense was committed by a person under sentence of imprisonment." § 13A-5-49(1). This includes persons on probation. § 13A-5-39(7). In May of 1984, the defendant was sentenced to ten years' imprisonment for robbery in the first degree. That sentence was suspended for five years' probation conditioned on the defendant's serving one year in prison. The defendant was released on probation on May 23, 1985. The offense occurred on May 29, 1985. (2) "The defendant was previously convicted of . . . a felony involving the use or threat of violence to the person." § 13A-5-49(2), Code. (3) "The capital offense was committed while the defendant was engaged or was an accomplice in the commission of . . . robbery." § 13A-5-49(4).
The trial court did not find the existence of any statutory mitigating circumstance listed under § 13A-5-51. The trial court did find the existence of four nonstatutory mitigating circumstances: (1) The defendant "was raised in poverty at the hands of an extremely abusive stepfather" and "was not afforded an opportunity to develop appropriate social skills or to enhance interpersonal skills." (2) The defendant had a good "work record," (3) a good military record, and (4) few adjustment problems during his incarceration for robbery. These findings concerning the aggravating and mitigating circumstances are supported by the evidence. *Page 496 
The trial court found that the aggravating circumstances outweighed the mitigating circumstances. Our independent weighing of the aggravating and mitigating circumstances supports the trial court's conclusion and indicates that death was, and remains, the proper sentence.
Considering both the crime and the defendant, we find that the sentence of death is neither excessive nor disproportionate to the penalty imposed in similar cases. See Beck v. State,396 So.2d 645, 654, n. 5 (Ala. 1980); Ex parte Luke, 444 So.2d 400,401 (Ala. 1983), cert. denied, Luke v. Alabama, 466 U.S. 993,104 S.Ct. 2374, 80 L.Ed.2d 846 (1984).
The judgment of the circuit court is affirmed.
AFFIRMED.
All Judges concur.