Donald Ray WALLACE, Appellant,

v.

STATE of Indiana, Appellee.

No. 84S00–8803–PC–00298.

Supreme Court of Indiana.

April 17, 1990.

Susan K. Carpenter, Public Defender, Margaret Hills, Special Asst., Indianapolis, for appellant.

Linley E. Pearson, Atty. Gen., Arthur Thaddeus Perry, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

Petitioner Donald Ray Wallace, Jr., appeals from the denial of post-conviction relief by the Vigo Circuit Court. Wallace was found guilty by a jury in the Vigo Circuit Court of four counts of murder and the death penalty was recommended in all four cases. This Court affirmed the judgment of the trial court in Wallace's direct appeal. *Wallace v. State* (1985), Ind., 486 N.E.2d 445, *cert. denied* (1986), 478 U.S. 1010, 106 S.Ct. 3311, 92 L.Ed.2d 723.

In post-conviction proceedings, the defendant bears the burden of proving his contentions by a preponderance of the evidence. *Young v. State* (1986), Ind., 500 N.E.2d 735. The trial judge, as trier of the facts, is the sole judge of the weight of the evidence and the credibility of the witnesses. *Young, supra; Rufer v. State* (1980), 274 Ind. 643, 646, 413 N.E.2d 880, 882. The defendant stands in the position of one appealing from a negative judgment. In such cases it is only where the evidence is without conflict and leads to but one conclusion, and the trial court has reached an opposite conclusion, that the decision will be disturbed as being contrary to law. *Young, supra.* The post-conviction relief process is not a substitute for a direct appeal, but is a process for raising issues not known at the time of the original trial or for some reason not available to the defendant at that time. *Id.; Kimble v. State* (1983), Ind., 451 N.E.2d 302, 303–04.

We note here, as we did in *Young, supra,* that Wallace seeks review of many issues that should have been set forth in

his original appeal. Ordinarily, appellate review at this point would be foreclosed. It appears that although the State did plead the issue of waiver at post-conviction trial, it did not object to the issues being tried on their merits. Furthermore, since the State did not file cross errors on appeal alleging the trial court erred in failing to make special findings and conclusions on the issue of waiver, we cannot base our decision on the waiver principle. *See, e.g., Johnson v. State* (1974), 262 Ind. 183, 186, 313 N.E.2d 542, 544. Since the trial court decided all of these issues on the merits, we must review them on the merits as well.

Wallace sets forth a number of issues which we have consolidated into eighteen (18), as follows:

1. Denial of a fair post-conviction hearing based on hybrid representation;

2. Denial of a fair post-conviction hearing based on judicial interference in the questioning of witnesses;

3. Ineffective assistance of trial counsel;

4. Violation of Wallace's right against self-incrimination;

5. Improper denial of motion to appoint social psychologist to study jury attitudes regarding their advisory role;

6. Erroneous refusal to qualify expert on subject of ineffective assistance of counsel;

7. Improper denial of motion to compel discovery and motion for continuance;

8. Erroneous failure to admit testimony regarding polygraph examination results;

9. Improper denial of motion for a new trial based on newly discovered evidence;

10. Failure of jury to specify whether it found Wallace guilty of murder or felony murder;

11. Trial court error in giving State's tendered Instruction No. 1;

12. Trial court error in instructing the jury on both the guilt and sentencing phases while still in the guilt phase of trial;

13. Improper repetition by trial court and prosecutors to jury during *voir dire* and closing argument regarding the jury's advisory role in recommending the death penalty;

14. Trial court error in giving Final Instruction No. 3;

15. Improper reliance by the trial court upon non-statutory aggravating circumstances in making its death penalty determination;

16. Improper final argument by prosecutors;

17. Ineffective assistance of post-conviction and appellate counsel; and

18. Eighth Amendment challenge to electrocution as a cruel and unusual means of administering the death penalty.

For the reasons set forth below, we affirm the Vigo Circuit Court's denial of post-conviction relief.

## I

Wallace raises several issues concerning the manner in which the trial judge conducted the post-conviction hearing which Wallace claims denied him of the basic and fundamental right to a fair hearing. It is apparent from the record that Wallace personally imposed himself in the conduct of the hearing, not only in addition to but at times in opposition to, the conduct of his counsel in attempting to present his case. Most notable was his insistence that he be permitted to act as co-counsel. His attorneys objected to this and not only expressed to him the lack of good judgment they saw in his decision, but asked the court not to permit him to take that stand. The attorneys' strategy was to attack the death sentence imposed and not his convictions for the four murders. This can be understood inasmuch as the evidence was very strong, and included statements by him that he did, in fact, commit the four murders. He wished to attack the convictions themselves and not the death penalty, and felt that if his convictions could be set aside, the death penalty would go down

with them. There were times when Wallace asked the court to permit him to fire his lawyers and proceed *pro se*. At other times, he wished to continue with them but act as co-counsel or to have the situation that has come to be called hybrid representation. The trial court finally permitted the hybrid representation and was faced with conducting the hearing with Wallace and his attorneys acting as counsel. Wallace now asks us to find that the trial court abused its discretion in permitting the hybrid representation because a death penalty case is too serious a matter to allow a defendant to assist in his own trial and that control of tactics and strategy are traditionally the province of counsel. It is difficult to discern an abuse of discretion when a trial court gives defendant exactly what he asked for where the record shows he was clearly informed of the ramifications of the decisions he was making and made reasoned judgments on how he wished to proceed. The principle that a criminal defendant is entitled to representation of counsel whether or not he can personally afford it is so basic, we need not cite legal authority for it.

■ In *Faretta v. California* (1975), 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562, the United States Supreme Court held that a criminal defendant cannot be forced to have counsel and must be permitted to represent himself, provided he makes a knowing and intelligent waiver of his right to counsel. Wallace insisted he have both. It is well established that where counsel is competent the court may deny hybrid representation in its discretion. That is, where the trial court finds the defendant is represented by competent counsel, the court need not permit him to act as co-counsel. *See Averhart v. State* (1984), Ind., 470 N.E.2d 666, 689, *cert. denied* (1985), 471 U.S. 1030, 105 S.Ct. 2051, 85 L.Ed.2d 323, and cases cited therein; *United States v. Gaines* (N.D.Ind.1976), 416 F.Supp. 1047. We see nothing in the facts here that would convince us the court would have erred in denying hybrid representation. Neither do we see, however, abuse of discretion in the trial court in permitting the hybrid representation at the insistence of Wallace himself. In the first place, the court heard arguments and motions from both counsel and Wallace and ruled on all of them. Second, to hold otherwise would be to place the trial judge in the untenable position of being unable to rule on the issue at all without committing error.

## II

■ Wallace points out instances in which the trial judge questioned witnesses and made statements which he claims showed a judicial interference and attitude that denied him a full and fair hearing. We first note that this was a bench hearing; no jury was subjected to the judge's attitudes which might have unduly affected their judgment. Further, we observe the statements made by the court were more in the nature of expressing impatience over repetition of evidence and issues that, in his opinion, were time consuming and unnecessary. We see no abuse in this area meriting reversal.

## III

In support of allegations of ineffective assistance of counsel in his original trial, Wallace's counsel at the post-conviction hearing attempted to call eight witnesses, consisting of family and acquaintances, to give Wallace's background by showing he had an unhappy childhood and was neglected by his parents. The purpose of this testimony was to demonstrate that these witnesses should have been called by trial counsel at the sentencing stage because their testimony would have been in mitigation of Wallace's commission of these crimes. Wallace objected to their testimony as he did not wish to make a direct attack on the sentence imposed but wished to direct his post-conviction petition to the murder convictions. He moved to strike that provision from the post-conviction petition over the objections of his own attorneys but the trial court permitted it to stay in. The court, however, granted his motion not to call these witnesses but did permit counsel to file affidavits of those witnesses, setting out their testimony as an offer to prove.

Wallace now claims the post-conviction court's order prohibiting the eight witnesses from testifying denied Wallace his right to present evidence in support of the allegations raised in his petition for post-conviction relief that he was denied the effective assistance of counsel at the penalty stage of his trial because his attorney did not present any mitigating evidence. We fail to see merit in this contention. When ineffective assistance of counsel is alleged and premised on the attorney's failure to present witnesses, it is incumbent upon the petitioner to offer evidence as to who the witnesses were and what their testimony would have been. *McBride v. State* (1987), Ind., 515 N.E.2d 865; *Brockway v. State* (1987), Ind., 502 N.E.2d 105, 108; *United States ex rel. Cross v. DeRobertis* (7th Cir.1987), 811 F.2d 1008, 1016, *aff'd sub nom. after remand, Cross v. O'Leary* (7th Cir.1990), 896 F.2d 1099. In *May v. State* (1986), Ind., 502 N.E.2d 96, this Court addressed the issue of whether trial counsel was ineffective for failing to present mitigating evidence at sentencing. This Court held that, by failing to present the letters and testimony which he contended his attorney should have offered at his sentencing, May had waived the issue. *Id.* at 104. If a defendant can waive such an issue by failing to properly present it, he certainly cannot now be heard to say the trial court abused its discretion by following his express demand that this particular mitigating evidence be withheld. This is particularly true when, in retrospect, the value and probativeness of the evidence is speculative at best.

### IV

As a part of this same incident, Wallace claims the court violated his right against self-incrimination when it encouraged him to testify concerning his request that the testimony of the eight witnesses be excluded. In his attempt to convince the post-conviction court that the witnesses should not be allowed to testify, Wallace suggested that he could testify as an offer to prove he had never wanted this sort of evidence presented on his behalf. After the court sustained his objection to the witnesses, the discussion still centered around the possibility of his testifying. His attorneys questioned the necessity of Wallace testifying in light of the fact that the post-conviction court had sustained his objection. The State insisted Wallace testify as an offer to prove, to which Wallace's attorneys objected. Wallace then sought to avoid testifying by suggesting his testimony was no longer relevant as the court had ruled in his favor. The judge then informed Wallace that he "would feel more comfortable if he testified." Wallace then proceeded to testify that he never wanted mitigating evidence presented on his behalf.

It is apparent that Wallace himself initiated the discussion and was not forced by the judge or anyone else to do so. Further, and more significantly, he made no incriminating statement. Simply stated, he had never wanted mitigating evidence presented in his behalf and had so stated to the court several times. He has failed to meet his burden of establishing error on this issue.

### V

Wallace moved the court to appoint a social psychologist to determine whether or not informing jurors of their advisory role in the death penalty sentencing scheme was likely to diminish their sense of responsibility for the penalty recommendation in violation of *Caldwell v. Mississippi* (1985), 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231. Wallace's motion was denied. Wallace concedes that refusal to appoint experts for indigent defendants is subject to reversal only for abuse of discretion. *Jones v. State* (1988), Ind., 524 N.E.2d 1284, 1286. The purpose for the expert here would not have been for the purpose of testifying to anything specific about this case or this defendant, rather, Wallace would have had this expert conduct a sociological study about juries generally. The court did not abuse its discretion in denying this request.

In connection with Wallace's request that a social psychologist be appointed, he called

Dr. Joseph Palladino to testify on similar studies that he had already made, to inform the court of the necessity of his proposed study, and to explain the preliminary plans for the study. The social psychologist, whom Wallace requested, was to work with Palladino on further studies to supplement those that Palladino had already made. Wallace had Palladino testify as to the nature in which the survey would be conducted and the need for it. Wallace mischaracterized this testimony as an "offer to prove." The court heard the evidence, subject to a motion to strike. After Palladino's direct examination was completed, the State sought to cross-examine Palladino. Defense counsel objected, claiming it was improper to allow cross-examination during an "offer to prove."

Although it is true that offers to prove can be made only during direct examination and are not proper on cross-examination, *Hernandez v. State* (1982), Ind., 439 N.E.2d 625, such was not the case here. This was not an offer to prove. Dr. Palladino was allowed to testify subject to a motion to strike. A proper offer to prove does not consist of testimony from a witness, but rather is an "offer" from counsel regarding what a witness would say, if he was allowed to testify. "I am making a record as to the substance and nature of the precluded testimony. Without such a record the appellate court has no information from which to make a ruling." The purpose of an offer to prove is to preserve for appeal the trial court's allegedly erroneous exclusion of evidence. *Reames v. State* (1986), Ind., 497 N.E.2d 559. We see no prejudice to Wallace meriting reversal. Wallace was permitted to make his record by completing his offer to prove. It follows he was not denied an opportunity to make his record in that regard. The State's subsequent cross-examination of the witness took nothing away from that record.

The court ultimately found Palladino's testimony to be irrelevant and denied Wallace's purported "offer to prove." Wallace claims this was error. Again, we disagree. The court heard Palladino's testimony concerning the nature of the survey and found it to be irrelevant. The fact that he did not permit the witness to testify further as to the manner of conducting additional surveys and their probative value does not demonstrate an abuse of discretion.

Finally, the State objected to the admissibility of portions of John Danberry and Attorney Dennis Balske's testimony. The court sustained some of these objections and Wallace sought to preserve the errors for appellate review by making similar "offers to prove" as to the substance of the proposed testimony. At the conclusion of each such offer, the State, over Wallace's continuing objections, was permitted to cross-examine each witness as to the testimony solicited during the purported "offers to prove." As was the case with Dr. Palladino's testimony, the court did not err in allowing the State to cross-examine these witnesses.

## VI

Wallace claims the court erred by refusing to qualify Attorney Dennis Balske as an expert on the subject of ineffective assistance of counsel in capital cases. Dennis Balske is an attorney from Montgomery, Alabama, and was called to testify as an expert witness on the subject of ineffective assistance of counsel, particularly as it refers to representing defendants in capital cases. Wallace showed Balske had litigated twenty-five (25) to thirty-five (35) felony cases of which twenty (20) to twenty-five (25) were capital murder cases. He had done appellate work before at least three state supreme courts and two federal circuit courts of appeal. He also worked with the Southern Poverty Law Center in Montgomery, Alabama, and has written and spoken on the subject of the death penalty. Balske was permitted to testify at length concerning the specific and particular manner in which a capital case is tried, including both the guilt phase and the penalty phase. In his opinion, the penalty phase tended to be the most important one in a capital case because the evidence was usually strong that the defendant did, in

fact, commit the murders but the question remained whether to give him the death penalty or a life sentence. Balske outlined in great detail the approach a defense lawyer in a capital case should take in investigating the defendant's background, including his psychological and psychiatric history, in order to present to the jury that, even though he had done some seriously bad things, this particular person should not be electrocuted. In Balske's opinion, trial counsel very competently handled the guilt phase but did not understand nor competently try the penalty phase.

The trial court's hesitancy to recognize Balske as an authority on Indiana law did not prejudice Wallace. The witness testified he was speaking of a general subject that is applicable in a death penalty case regardless of whether it is tried in Indiana or any other state. The judge did question the witness as to his knowledge of handling juries in Indiana and to what extent he had investigated the trial of this particular case in Terre Haute, Indiana. In his conferences with counsel and examination of the witness, as well as his statements in his findings of fact entered in the judgment, the judge expressed his concern that the witness had not examined the entire record of this cause. Moreover, the witness had not discussed the case with trial counsel or the defendant, and had not reviewed many other facets of this trial in Terre Haute, Indiana, but spoke only generally of things that ought to be done based on what the witness called a national standard approved by those enlightened on the subject. The judge expressed the view that before anyone could form an opinion on the competence of an attorney concerning a particular case based on standards of strategy, one would have to know the circumstances of the case being tried and the wisdom of applying one plan of strategy as compared to another. The judge felt this witness had not done that and was prone to find his testimony to be of limited value in determining the competency of counsel in this case. This was the trial judge's responsibility and duty in hearing and weighing testimony in a case such as this. We find no reversible error in his decision on this issue.

## VII

■ Wallace claims the post-conviction court's failure to compel the State to fully comply with his motions for discovery and failure to grant him a continuance prevented him from adequately investigating his case before proceeding to hearing. On January 21, 1987, Wallace, by counsel, filed a motion for the State to reveal agreements entered into between the State and prosecution witnesses, and further submitted interrogatories to the State presumably on that subject although Wallace's brief does not point this out. The State did not respond to these requests and on February 26, 1987, Wallace filed a Verified Motion to Compel Discovery. Wallace also filed a Motion for Continuance based upon the State's failure to comply with his discovery request. The trial court set these motions for hearing on March 6, 1987. The hearing on March 6 appears to have been rather heated. Wallace claims the judge was sarcastic and impatient and declared he did not intend to retry the entire murder case. Wallace claims the judge's statements clearly revealed his opinion that Wallace was not entitled to the discovery he sought. The court did, however, order depositions of the State's witnesses at public expense, and the State agreed to open its file to Wallace, excluding only those items clearly considered to be work product. Wallace still claims the court did not require the State to furnish sufficient discovery materials to him to adequately prepare his case but fails to inform us what information he failed to get and how it might have helped him in his post-conviction efforts.

The same is true of Wallace's motion for continuance. Wallace had already received a continuance from the January 30, 1987, setting and was seeking another one from the April 6, 1987, setting. He claims he wished to make further investigation of additional issues such as a second suspect, neurological defenses, and prosecutorial misconduct but gives no details as to what he expected to find or what reason he had for supposing there might be evidence sup-

porting such defenses. The record shows that following the March 6 hearing, the court granted a motion to take the depositions at public expense and expressed the feeling that should take care of the problem. After further discussion of the discovery issues, the State offered to go through its entire file, delete work product, and permit defense counsel to copy the entire file with work product deleted. Defense counsel stated to the court: "That's more than acceptable with us." Finally, the court asked: "Anything further needed at this time?" and defense counsel mentioned only her request for a continuance.

Matters of discovery and continuances lie within the discretion of the trial court. To find abuse of discretion, the record must show the defendant was prejudiced by the court's ruling on these two subjects. *Murray v. State* (1982), Ind., 442 N.E.2d 1012, 1016. No such showing is made and we find no error meriting reversal.

## VIII

■ Wallace sought to admit testimony as to a polygraph examination administered to him. There was no agreement or stipulation to enter the polygraph results into evidence. Wallace concedes that absent such stipulation, polygraph results are inadmissible in Indiana. *Goolsby v. State* (1987), Ind., 517 N.E.2d 54, 57. Wallace urges this Court to reconsider prior rulings and find that polygraph examinations are sufficiently reliable to merit their admission into evidence. We decline to do so for reasons expressed in *Goolsby, supra,* and cases cited therein.

## IX

Wallace claims the trial court erred in denying him a new trial based on newly discovered evidence. The standard of review for determining the existence of newly discovered evidence is:

(1) that the evidence has been discovered since the trial; (2) that it is material and relevant; (3) that it is not cumulative; (4) that it is not merely impeaching; (5) that it is not privileged or incompetent; (6) that due diligence was used to discover it

in time for trial; (7) that the evidence is worthy of credit; (8) that it can be produced on a retrial of the case; and (9) that it will probably produce a different result.

*Wilson v. State* (1987), Ind., 511 N.E.2d 1014, 1019; *Augustine v. State* (1984), Ind., 461 N.E.2d 101, 104.

Witness Boylls testified at the original trial that he and Anita Hoeche were with Wallace on the night in question and left him at a Hardee's Restaurant. Wallace was prepared to call James Stickler, a private investigator for the office of the State Public Defender, to testify at the post-conviction hearing, but on March 24, 1987, Boylls told Stickler that he had not testified truthfully at trial. Boylls said he and Anita Hoeche had made up the story they told the police and that they did not leave Wallace at the Hardee's Restaurant but left him at the Hoeche home. James Stickler did testify to this and witness Boylls testified he recalled talking to Stickler but did not make those statements to Stickler and reaffirmed the testimony he had given at the original trial. Witness Mary Lukes testified that on the night of January 14, 1980, at about 7:20 p.m., she saw an automobile that met the description and appeared to her to be the automobile that was used by Wallace at the time of the murders in question. Pictures on television showed Wallace and this automobile, which had been seen by other witnesses who so testified at the original trial, in Wallace's possession on the street where the murders occurred. Mrs. Lukes indicated she had seen this same automobile on a different street but on the same side of town and it contained three people, one man, meeting Wallace's description, one other man and one woman. She reported this to the police but was never questioned further. Finally, John Danberry, a former Indiana State Police officer, testified he gave Wallace a polygraph examination on February 24, 1987. He testified that the version Wallace gave him was that Wallace and another person had committed a burglary on both the Hendricks and the Gilligan home and that the other person was the one who

actually shot the four people. Wallace claimed he was in the Hendricks home next door at the time. When he returned to the scene and saw that the other person had shot all four of the people in the Gilligan home, Wallace noticed that the father was moving and moaning, and he, Wallace, picked up a bar bell and struck him in the head to end his suffering. Danberry testified it was his opinion that Wallace was telling the truth when he gave this story. Wallace now claims the testimony of these four witnesses constitutes newly discovered evidence justifying the granting of a new trial.

We note at the outset the testimony of Officer Danberry would not be admissible and does not qualify under the rules set out in *Wilson, supra,* and *Augustine, supra.* The testimony of the other witnesses tends to be impeaching or cumulative of facts not calculated to cause a different result. There was testimony involving Wallace and the white vehicle on the street where the murders occurred. Lukes' testimony placed the vehicle, or at least the witness' opinion that it was the same vehicle, on a different street with other occupants in the vehicle. Wallace claims the inference that he was not alone when he committed this crime might have deterred the jury from giving him the death penalty. There were several witnesses in the neighborhood who testified Wallace had been seen alone in this vehicle on the street where the Gilligan residence is located at about the time the murders were committed. The trial judge was justified in finding that this witness' testimony would not have changed the outcome of the trial. The same is true of Boylls' trial testimony. He had testified Wallace told him and Hoeche certain facts relating to the murder of the Gilligan family. The impact of this testimony is unlikely to be lessened by a change in the designation of the place Boylls and Hoeche dropped Wallace off. At any rate, Boylls claims his testimony at trial was true, still is true, and denies he ever changed it. The likelihood, therefore, that Boylls would testify differently at a new trial or that this testimony would have any probative value is lacking.

The trial court did not err by denying a new trial on the basis of the proposed testimony of these witnesses.

X

Wallace claims the post-conviction court erred in denying his post-conviction relief petition because the jury returned verdicts without specifying whether it had found Wallace guilty of murder or felony murder. Wallace claims the trial court instructed the jury on the elements of both felony murder and murder and, therefore, the jury was required to designate which of them they were finding Wallace guilty. Wallace is correct that he could not be found guilty of intentional murder since he was not charged with that crime and it is not included in the charge of felony murder. However, the jury was not given that option in the instructions of the court. The court instructed on this subject as follows:

The crime of murder is defined by statute as follows:

A person who knowingly or intentionally kills another human being, or kills another human being while committing or attempting to commit burglary, commits Murder, a felony.

To convict the defendant the State must have proved each of the following elements:

The defendant

1. killed
2. another human being (name)
3. while committing or attempting to commit burglary.

If the State failed to prove each of these elements beyond a reasonable doubt, you should find the defendant not guilty.

If the State did prove each of these elements beyond a reasonable doubt, you should find the defendant guilty of murder, a felony.

The first paragraph of the instruction gives the statutory definition which includes intentional murder and felony murder. The court goes on to instruct, however, that to convict the defendant the State must prove the elements of felony

murder. He then instructs the jury that if the State failed to prove each of these elements beyond a reasonable doubt they should find the defendant not guilty. The jury was then instructed that if the State proved each of these elements beyond a reasonable doubt, the jury should find the defendant guilty of *murder, a felony.* The jury returned verdicts finding Wallace guilty of murder, a felony. The mention of intentional murder was merely in the definitional part of the statute read to the jury and they were not given the option of considering either or both of them in reaching a verdict. We deal only with a question of semantics in saying the jury found him guilty of murder. The jury was instructed that they must find all of the elements of felony murder proved beyond a reasonable doubt before they could find the defendant guilty of murder. The statute provides that a person committing either type of murder commits murder, a felony. The charge, the evidence, and the instruction of the court were on the subject of felony murder and the verdict of the jury is not inconsistent or equivocal.

## XI

▇▇▇ Wallace claims the trial court erred in giving State's tendered Instruction No. 1 because it shifted the burden of proof on the issue of intent to Wallace.

Instruction No. 1 provided:

While it is necessary that every essential element of the crimes charged against the accused must be proved by the evidence beyond a reasonable doubt this does not mean that all incidental or subsidiary facts must be proven beyond a reasonable doubt. Evidence is not to be considered in fragmentary parts and as though each fact and circumstance stood apart from the others but the entire evidence is to be considered and the weight of the testimony is to be determined from the whole body of the evidence. A circumstance considered apart from other evidence may be weak if not improbable but when viewed in connection with surrounding facts and circumstances it may be so well supported as to

remove all doubt as to its existence. *Acts considered apart from other evidence may appear innocent but when considered with other evidence may import guilt.* [Emphasis added.]

Wallace contends the instruction created an inference of guilt, thereby shifting the burden to Wallace and denying him the presumption of innocence. He cites *Sandstrom v. Montana* (1979), 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39. The *Sandstrom* Court found that an instruction that stated: "[t]he *law presumes* that a person intends the ordinary consequences of his voluntary acts" could have been interpreted by a reasonable juror as giving the presumption conclusive or persuasion-shifting effect that would require the defendant to come forward with evidence to rebut the presumption. *Id.* at 517–19, 99 S.Ct. at 2455–57, 61 L.Ed.2d at 46–48 (emphasis in original). No such presumption is created by Instruction No. 1 in the instant case. The instruction informed the jury concerning the meaning of reasonable doubt and how it was to be applied in interpreting facts. A nearly identical instruction was approved by this Court in *Grassmyer v. State* (1981), Ind., 429 N.E.2d 248, 255–56. *See also Collins v. State* (1981), 275 Ind. 86, 101, 415 N.E.2d 46, 57, *cert. denied* (1981), 451 U.S. 991, 101 S.Ct. 2331, 68 L.Ed.2d 851.

The trial court did not err in so instructing the jury.

## XII

▇▇▇ State's witness, Mark Boylls, testified he knew Wallace had been in the penitentiary before. Defense counsel moved for a mistrial which was ultimately denied after extensive argument. The trial court admonished the jury not to consider the statement made by Boylls. In his admonishment, he told the jury that under no condition at any time in the trial, in either the first phase concerning guilt or the second phase concerning whether or not to recommend the death sentence, should they consider Boylls' statement. Wallace does not claim the trial court erred in denying the motion for mistrial but claims that the court's statement instructing them on both

the guilt and sentencing phases while they were still in the guilt phase gave the impression to the jury that the judge knew the defendant was guilty and knew they would reach the sentencing phase. Wallace correctly cites opinions of this Court which hold a trial judge must refrain from comments which tend to indicate his opinion as to the weight or the sufficiency of the evidence, the credibility of witnesses, the guilt of the accused or any fact in controversy. *Abernathy v. State* (1988), Ind., 524 N.E.2d 12; *Brannum v. State* (1977), 267 Ind. 51, 366 N.E.2d 1180. We fail to see that the language used by the judge here imported the opinion that the defendant was guilty so that a sentencing phase would certainly be forthcoming. The admonishment informed the jury only that they were to put the information out of their mind and not consider it at any stage or phase of the trial. No reversible error is presented on this issue.

## XIII

Wallace claims the trial judge and prosecutors during *voir dire* and closing argument repeatedly represented to jurors that their sentencing recommendation was merely advisory and not binding on the trial court. He claims these representations were misleading as they implied to the jury that it would play no role in Wallace's sentencing and thereby diminished the jury's sense of responsibility. Wallace cites *Caldwell v. Mississippi* (1985), 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231. We do not feel the discussions, particularly during *voir dire*, on the subject of the jurors' responsibilities, rose to the level that the United States Supreme Court found to exist in *Caldwell*. Discussions on the subject in the instant case arose by the jurors themselves, who discussed the seriousness of their role as jurors and inquired as to what their role was. At no time did the judge or prosecutors tell them they were relieved of concern because the ultimate responsibility rested with the judge or this Court.

In *Caldwell*, on the other hand, the defense attorney informed the jury that the awesome responsibility for determining Caldwell's fate was in their hands. The prosecutor responded that the defense had been unfair in having the jury believe its judgment would be final and not subject to any review. The prosecutor then proceeded to tell the jury that he thought it was unfair for the defense to insinuate that their decision was final and that they would take Bobby Caldwell out in front of the courthouse in moments and string him up. He stated: "they know, as I know, and as Judge Baker has told you, that the decision you render is automatically reviewable by the Supreme Court." *Caldwell*, 472 U.S. at 325–26, 105 S.Ct. at 2638, 86 L.Ed.2d at 237. The Supreme Court found it was constitutionally impermissible to rest the death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere. The Court then stated:

This Court has repeatedly said that under the Eighth Amendment "the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination." *California v. Ramos*, 463 U.S., at 998–999 [103 S.Ct. 3446, 3451–3452, 77 L.Ed.2d 1171]. Accordingly, many of the limits that this Court has placed on the imposition of capital punishment are rooted in a concern that the sentencing process should facilitate the responsible and reliable exercise of sentencing discretion. See, *e.g.*, *Eddings v. Oklahoma*, 455 U.S. 104 [102 S.Ct. 869, 71 L.Ed.2d 1] (1982); *Lockett v. Ohio*, 438 U.S. 586 [98 S.Ct. 2954, 57 L.Ed.2d 973] (1978) (plurality opinion); *Gardner v. Florida*, 430 U.S. 349 [97 S.Ct. 1197, 51 L.Ed.2d 393] (1977) (plurality opinion); *Woodson v. North Carolina*, 428 U.S. 280 [96 S.Ct. 2978, 49 L.Ed.2d 944] (1976).

*Caldwell*, 472 U.S. at 329, 105 S.Ct. at 2639–40, 86 L.Ed.2d at 239.

Of concern to the United States Supreme Court was the fact that an appellate tribunal does not consider the same factors that the trial jury does in making the initial determination of appropriateness of the

death penalty. Certain "compassionate or mitigating factors" that the jury considers as the original fact finders would not be reviewed by the Supreme Court and, in fact, the jury's ultimate decision would be reviewed with a presumption of correctness. Since appellate courts do not impose a death penalty but merely review the jury's decision and that review is with a presumption of correctness, the Court concluded a defendant might be executed although no sentencer had ever made a determination that death was the appropriate sentence. *Id.* at 330–32, 105 S.Ct. at 2640–41, 86 L.Ed.2d at 240–41.

Discussions questioned by Wallace in the instant case concern those raised by jurors themselves in wanting to know their role in arriving at the very serious decision they were going to be asked to make. *Voir dire* of jurors was first made individually in the judge's chambers inquiring of them their knowledge and opinion of the case based on publicity in the area. Apparently the jurors were to be qualified on the basis of any prejudice they might have attained by such publicity and were screened before being put on *voir dire* in the jury box. During these sessions, Juror Page had indicated to the judge and attorneys that he had served on a jury some years before, apparently in a case involving the death penalty, and wanted to know the difference in the law at the present time. The judge explained to him the changes in the law, and told him the jury does not send a defendant to the electric chair. The judge explained that the jury recommends to him whether or not they want to sentence a defendant to the electric chair and that he is not bound by their recommendation either for or against, so, in effect, the individual juror is not absolutely responsible for a decision for or against the death penalty. The juror expressed confusion but the prosecutor explained to him what the statute provided.

Wallace points out that during *voir dire* of the jury in the courtroom, each time a new group of prospective jurors was seated, the trial judge read to them the statute outlining their responsibility as jurors. That statute outlined what they were to

find before they could impose the death penalty, such as aggravating and mitigating factors, and explained to them their role in recommending to the trial judge whether or not the death penalty should be imposed. Wallace claims the court unduly emphasized this issue to the jury by reading the statute to them each time new jurors came on. There is, of course, no merit to this contention. It was proper for the court to read to the jury the statute outlining their duties. He did not emphasize any particular provision of the statute. We can assign no error to a trial court for advising a jury on the law. *Huffman v. State* (1989), Ind., 543 N.E.2d 360, 372. In fact, he has a duty to see that they understand what their responsibilities are. Juror Page, who had had the discussion with the judge and counsel in chambers, discussed the fact that the judge would make the final decision but he would have to make the recommendation. Page did not say that this procedure would make him take his responsibility lightly, rather, he said he would not make the recommendation unless he thought the facts warranted the death penalty. He said he would not want to be the one who pulled the switch that killed someone and he had strong feelings about making judgments of that type because he believed God gives life and God takes life. He stated, however, that he thought he had a responsibility as a citizen to do things such as this even though he did not like to. He likened the situation to the fact that he had helped fight in World War II. Even though the war endangered his life and he did not want to fight, he felt it was his duty and responsibility to do so. Juror Porter discussed the fact she was aware they were making a recommendation and the judge would have to make the final decision, and when asked if this gave her some comfort, she said "yes" but further stated she thought her responsibility was a very serious one. As in any capital case, there was lengthy discussion with jurors concerning the responsibility of sitting in judgment of another human being and determining whether or not he should be put to death. The jurors expressed their seri-

ousness and sense of responsibility and their willingness to do it. At no point did the judge or prosecutors encourage them that they need not be concerned because it was someone else's responsibility and not theirs. Rather, as we have pointed out, the jurors expressed that they recognized the serious responsibility they faced.

Unlike *Caldwell*, the instant case does not concern remarks referring to the responsibility of the Supreme Court, but rather, discussions of the ultimate responsibility of the trial judge to accept or not accept the jury's recommendation and to finally impose the sentence. This, of course, presents a different question because the position and responsibility of the judge is much more closely related to the jury's than is that of an appellate court.

In *Adams v. Wainwright* (11th Cir.1986), 804 F.2d 1526, *modified sub nom. on denial of rehearing, Adams v. Dugger* (11th Cir.1987), 816 F.2d 1493, the Eleventh Circuit found that the *Caldwell* ruling applied where the jury was led to believe that the trial judge, not the jury, had the responsibility for making the death sentence judgment. In *Adams*, the trial court judge instructed the initial panel of prospective jurors regarding the nature and effect of their role in recommending a sentence in a capital murder trial as follows:

> The Court is not bound by your recommendation. The ultimate responsibility for what this man gets is not on your shoulders. It's on my shoulders. You are merely an advisory group to me in Phase Two. You can come back and say, Judge, we think you ought to give the man life. I can say, I disregard the recommendation of the Jury and I give him death. You can come back and say, Judge, we think he ought to be put to death. I can say, I disregard your recommendation and give him life. So that this conscience part of it as to whether or not you're going to put the man to death or not, that is not your decision to make. That's only my decision to make and it has to be on my conscience. It cannot be on yours.

*Adams*, 804 F.2d at 1528. The judge had intended to give this explanation to the entire venire before the selection process began, but forgot to do so. Hence, each time new prospective jurors were seated in the jury box, a substantially similar explanation was given. This occurred nine separate times. *Id.* at 1528, n. 2. The Eleventh Circuit accordingly remanded the case to the district court with instructions to issue a writ of *habeas corpus* if the State of Florida did not "afford Adams a new sentencing proceeding before an untainted jury." *Id.* at 1536.

The United States Supreme Court granted certiorari in *Dugger v. Adams* (1988), 485 U.S. 933, 108 S.Ct. 1106, 99 L.Ed.2d 267. They reversed the Eleventh Circuit, but did so on a procedural question rather than the substantive *Caldwell* issue. *Dugger v. Adams* (1989), 489 U.S. 401, 109 S.Ct. 1211, 103 L.Ed.2d 435, *reh. denied* (1989), —— U.S. ——, 109 S.Ct. 1770, 104 L.Ed.2d 205. Prior to the *Caldwell* decision in 1985, Adams had a direct appeal, a post-conviction hearing, and a habeas corpus hearing before a federal court. He failed to raise this issue in any of those proceedings. After the *Caldwell* opinion, he brought another post-conviction petition in the state trial court on the *Caldwell* issue and the state court found he had waived the issue because he failed to raise it, though apparent, on direct appeal. On his second federal habeas corpus petition, the Eleventh Circuit found there was cause for respondent's procedural default since he could not be expected to recognize the *Caldwell* issue until it had been decided in 1985. The United States Supreme Court reversed the Eleventh Circuit on this issue, finding that Adams showed no just cause for failing to raise the issue since it was based on violation of a state statute to provide the basis for Eighth Amendment jurisprudence. Since Adams had the opportunity but still did not raise the issue of the violation of the state statute, the state court was justified in finding he had waived his right to make the claim at that time; consequently, Adams did not show sufficient grounds for a federal court to

review an issue which the state court had found to be procedurally defaulted.

The *Adams* Court expressly indicated it was not deciding the *Caldwell* issue on the merits but did indicate that a *Caldwell* violation occurs only when the jury is misinformed as to their role under state law:

> We believe that the Eleventh Circuit failed to give sufficient weight to a critical fact that leads us to conclude, without passing on the Court of Appeals' historical analysis, that *Caldwell* does not provide cause for respondent's procedural default. As we have noted, the decision in *"Caldwell* is relevant only to certain types of comment—those that mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision." *Darden v. Wainwright*, 477 U.S. 168, 184, n. 15, 106 S.Ct. 2464, 2474, n. 15, 91 L.Ed.2d 144 (1986). As respondent conceded at oral argument, if the challenged instructions accurately described the role of the jury under state law, there is no basis for a *Caldwell* claim. *To establish a Caldwell violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law.* See, *e.g.,* Tr. of Oral Arg. 29, 32, 33, and 36–37. Respondent therefore must be asserting in this case that the trial court's remarks violated state law, and in finding a *Caldwell* violation in this case, the Court of Appeals must have concluded that the remarks in question were error under Florida law.

*Adams,* 489 U.S. at ——, 109 S.Ct. at 1215, 103 L.Ed.2d at 443 (emphasis added). There is no showing here of remarks by the judge and/or prosecutors directed to the jury improperly describing their role pursuant to Indiana law.

Accordingly, the trial court properly found no post-conviction relief was forthcoming to Wallace on this issue.

### XIV

■ Wallace claims the trial court erred in giving Final Instruction No. 3 that enumerated the aggravating circumstances provided for in Ind.Code § 35–50–2–9(e)(2) for which the death penalty may be imposed. Wallace complains this instruction did not inform the jury that it may recommend the death penalty only if it finds that mitigating circumstances which may exist are outweighed by the aggravating circumstance or circumstances. There is no merit to this contention. The first paragraph of Instruction No. 3 explained to the jury that this instruction concerns aggravating circumstances. Each instruction does not have to contain all the law within its four corners. Instruction No. 1 instructed the jury that they may recommend the death penalty if they find proof beyond a reasonable doubt of at least one of the aggravating circumstances and that any mitigating circumstance or circumstances that exist are outweighed by the aggravating circumstance or circumstances. Defendant's tendered Instruction No. 2 stated that the State of Indiana had the burden "to prove beyond a reasonable doubt both the question of whether the alleged aggravating circumstances exist and on the question of whether the alleged aggravating circumstances outweighed any mitigating circumstances." Defendant's tendered Instruction No. 7 further explained the jury's duty to consider mitigating circumstances and stated: "If that Juror finds that any aggravating circumstances alleged do not outweigh this particular mitigating circumstance beyond a reasonable doubt, then that Juror must vote against the recommendation of death."

■ Wallace further claims the court was obligated to instruct the jury that even if it found the aggravating circumstances outweighed the mitigating circumstances, it could still recommend against the death penalty. He claims the failure to instruct the jury on its right to extend mercy unconstitutionally restricted its sentencing options and denied him a fair penalty proceeding. Wallace cites this Court's decision in *Williams v. State* (1988), Ind., 525 N.E.2d 1238, for the proposition that the jury could have been misled into incorrectly recommending the death penalty even if it felt

the sentence was inappropriate. However, unlike the situation in *Williams, supra,* the jury here was not instructed that it *should* recommend the death penalty if the aggravating circumstances outweighed any mitigating circumstances. Nor can *Williams* be read to require a trial judge to instruct the jury that, even though the State has totally carried its burden on every issue, the jury may, if it wishes, still find the defendant not guilty or, in this case, not impose the death penalty. Unquestionably the jury has that power. The question is whether the trial judge needs to expressly tell them they do in those terms. We know of no such statutory or common law requirement. The jury here was told, among other things, that it was in their province to determine whether or not the State had proven the burdens it had beyond a reasonable doubt, that they were the judges of the law and the facts, and that they had a right to consider any mitigating circumstance that any of them might find appropriate. The trial court was justified in finding no grounds for post-conviction relief on this issue.

## XV

██ Wallace claims the post-conviction court erred in denying him relief on the grounds the trial court improperly relied upon non-statutory aggravating circumstances in making its death penalty determination. The record shows the trial court entered lengthy findings of fact in which it found that the State had proved beyond a reasonable doubt the existence of two aggravating circumstances that warranted the death penalty. The first aggravating circumstance was that this was a multiple slaying, that Wallace murdered, in order, Patrick Gilligan, Teresa Gilligan, Lisa Gilligan and Gregory Gilligan. Second, Wallace murdered these four victims while committing the crime of burglary. These two aggravating circumstances were supported by the evidence and were enumerated grounds pursuant to IC 35–50–2–9. The court further made findings regarding the lack of any mitigating circumstances and discussed all of these issues at length. In addition to these enumerated circumstanc-

es, the judge discussed the fact that, following the commission of these offenses, Wallace indicated an intent to conceal his act. Moreover, the court found Wallace's conduct surrounding the circumstances of this case showed a total disregard for human life and that the imposition of anything less than the death sentence would depreciate the seriousness of the offense. He further found these crimes had been committed while Wallace was on parole and that he has had a long history of serious criminal conduct. Thus, the trial court made sufficient and proper findings justifying the imposition of the death penalty. After finding the statutory grounds for aggravating circumstances had been proved beyond a reasonable doubt and outweighed any mitigating circumstances, it was proper for the court to give these other findings to justify his finding that the death penalty was appropriate for this defendant considering his commission of these crimes. *Townsend v. State* (1989), Ind., 533 N.E.2d 1215, 1234, *cert. denied* (1990), —— U.S. ——, 110 S.Ct. 1327, 108 L.Ed.2d 502.

## XVI

██ Wallace gives numerous instances of the prosecutors' final argument which he claims was improper and put him in grave peril. The standard used to review such a claim is set down in *Maldonado v. State* (1976), 265 Ind. 492, 498–99, 355 N.E.2d 843, 848. We review to determine whether misconduct has occurred, and if it has, whether this misconduct placed the defendant in a position of grave peril to which he should not have been subjected. Grave peril is measured by the probable persuasive effect of the misconduct on the jury's decision and even if an isolated instance does not establish grave peril, repeated instances evidencing a deliberate attempt to improperly prejudice the jury may present reversible error. *Id.* It is improper for a prosecutor to assert his personal knowledge of facts in issue or assert his personal opinion as to the credibility of a witness or as to the guilt or innocence of the accused. *Evans v. State* (1986), Ind.,

497 N.E.2d 919, 922. It is proper, of course, for the prosecutor to comment on the evidence. In reviewing the portions of final argument of the prosecutors in the record, we find no instance of remarks that would be improper to the extent reversal is warranted under the standards set out above. Further, Wallace fails to show he objected at any time at trial. We find no reversible error on this issue.

## XVII

Wallace claims he should have been granted post-conviction relief since he was denied the effective assistance of trial and appellate counsel. Our standards of reviewing such an issue are well-established. There is a strong presumption that counsel is competent. *Stewart v. State* (1988), Ind., 517 N.E.2d 1230, 1233. Isolated poor strategy, inexperience, or bad tactics do not necessarily constitute ineffective assistance. *Smith v. State* (1987), Ind., 516 N.E.2d 1055, 1059. The defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that he was not functioning as counsel guaranteed under the Sixth Amendment and, further, the defendant must show the deficient performance prejudiced his defense by errors so serious as to deprive him of a fair trial and a trial the result of which is reliable. *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674, *reh. denied* (1984), 467 U.S. 1267, 104 S.Ct. 3562, 82 L.Ed.2d 864; *Lawrence v. State* (1984), Ind., 464 N.E.2d 1291, 1294.

■ Wallace claims his trial and appellate counsel demonstrated ineffectiveness by not making proper objection and preserving issues presented at the post-conviction level and on this appeal, enumerating each of them. We have found these issues did not present reversible error. Accordingly, the failure of counsel to raise them cannot be seen as ineffectiveness warranting reversal at this point.

■ Wallace further claims his counsel was ineffective because he failed to present sufficient mitigating factors regarding Wallace's character. Wallace claims his counsel should have presented evidence of Wallace's past, both good and bad, in detail. He cites *Hitchcock v. Dugger* (1987), 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 and *Lockett v. Ohio* (1978), 438 U.S. 586, 604, 98 S.Ct. 2954, 2964–65, 57 L.Ed.2d 973, 990 (plurality opinion) for the principle that the sentencer not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death. Wallace points out there is a growing acceptance nationwide that the proper way to present a defense to a jury in a death penalty phase is to present at length the defendant's entire background including both bad and good aspects. This would tend to humanize the defendant to the jury and result in their finding the death penalty inappropriate considering the defendant's background even though he clearly committed a capital crime. Evidence was presented recommending the wisdom of such strategy by three expert witnesses, consisting of two trial lawyers and a law school professor. All three felt counsel was ineffective because he did not choose to call witnesses to testify in this area. Counsel testified he considered showing more details of Wallace's background, but because it showed what he termed a "horrendous pattern," he felt it might backfire and cause the jury to think this was a young person whose life had been worthless and directed to violence and crime and they were given no justification for preserving and continuing it. He did not expect any details of Wallace's past criminal activity to come before the jury because they were inadmissible. One witness had made a statement referring to his knowledge that Wallace had been in prison. The court admonished the jury to disregard this and even though it frustrated counsel in that it revealed to the jury that there was some criminal activity in Wallace's background, he did not feel it warranted bringing forth all of the details. Counsel did bring witnesses, consisting primarily of a minister and a rabbi, who both gave

reasons why the death penalty should not be imposed.

Wallace now asks this Court to find the strategy outlined by the three expert witnesses, a strategy that these experts characterize as a growing and acceptable strategy in capital penalty presentations before a jury, is the only acceptable one. We decline Wallace's offer to hold any other strategy, even though reasoned by counsel to be the more appropriate one for his client, represents ineffectiveness of counsel warranting reversal. The principle stated in *Hitchcock, supra,* and *Lockett, supra,* provides that, pursuant to the Eighth and Fourteenth Amendments, any and all mitigating factors concerning a defendant's character, background or record may not be *precluded* from being presented to the sentencer for consideration of whether or not to impose the death penalty. Certainly, these decisions cannot be read to require that a particular strategy is the only acceptable one. Counsel needs to make a judgment in any given case as to what strategy to pursue concerning all the facts and circumstances facing him. This has to do with the nature of the crime, the strength of the evidence implicating the defendant, and the background which might be presented by particular witnesses. It may seem advisable to put on a limited amount of background evidence or, in the alternative, all of the defendant's background including those aspects which would paint an undesirable picture of him. In retrospect, one might find that a different strategy might have worked better, but the fact that the chosen one failed is not proof of ineffectiveness of counsel. As the State points out, if this Court were to hold that trial counsel was incompetent for not pursuing a particular strategy, all future counsel in capital cases would be bound by that holding and compelled to pursue a particular strategy laid down in advance by this Court even if the attorney, after careful consideration, felt another strategy was more appropriate. Trial counsel stated he was aware of the alternative approach to his defense but chose the route he did based on the facts and circumstances of his defendant and the evidence presented at trial. It would be nothing more than speculation for us to presume the results might have been different had he chosen the route recommended by the three experts. Pursuant to standards set out in *Strickland, supra,* and *Lawrence, supra,* we do not find that petitioner has carried his burden of showing ineffective assistance of counsel on this issue.

█ The final claim of ineffectiveness is counsel's failure to submit Wallace to a polygraph examination. Apparently Wallace had requested that he be administered a polygraph examination at the time of his arrest. He wanted to be asked whether he was at the scene of the crime and whether he pulled the trigger. No such examination was given at that time. Wallace now points out that a polygraph examination was administered to him in 1987 at the Indiana State Prison. The polygraph examiner was of the opinion that Wallace was telling the truth when he said he was not the one who pulled the trigger and killed the four people. Wallace's contention at this point is that had he been given a polygraph examination prior to trial, he would have had a heavy weapon in his defense, particularly at the sentencing stage. Wallace acknowledges that polygraph examinations are not admissible into evidence unless all parties so stipulate. However, he overcomes this by arguing that technology has developed to the extent that polygraph examinations are now reliable and throughout his brief suggests this Court should change its rule, particularly in a death penalty sentencing hearing. We decline to change this rule at this time because we are not convinced polygraph examinations are any more reliable today than previously thought to be by this Court and all other jurisdictions in the country. Furthermore, Wallace does not articulate his thinking whether such a test result should be admitted at a death penalty hearing only in favor of a defendant or if it should be admissible in all respects and by all parties. Because efforts by trial counsel to have a polygraph taken could not have produced admissible evidence, we cannot find failure to administer it to be

grounds for finding incompetency of counsel.

## XVIII

■ Finally, Wallace claims that electrocution is a cruel and unusual means of administering the death penalty in violation of the Eighth Amendment. This Court has decided this issue adversely to Wallace's arguments in *Fleenor v. State* (1987), Ind., 514 N.E.2d 80.

The post-conviction court is affirmed.

SHEPARD, C.J., and GIVAN, J., concur.

DeBRULER, J., concurs and dissents with separate opinion in which DICKSON, J., concurs.

DeBRULER, Justice, concurring and dissenting.

Appellant was convicted on four counts of felony murder for the killing of the Gilligan family while committing a burglary. The State sought the death penalty based upon two statutory aggravating circumstances, namely, intentional killing in the course of a burglary and the multiple murders. The jury recommended death. The judge found in support of the first aggravator that the State proved that appellant "murdered" the victims, and not that he had "intentionally" killed them, and on this departure from the statutory standard I partially based my dissent in the direct appeal. *Wallace v. State* (1985), Ind., 486 N.E.2d 445, 464 (opinion of DeBruler, J., concurring in result and dissenting in which Prentice, J., concurred). I also based that dissent on the departure from the statutory standard when the judge found that a sentence of anything less than death would "depreciate the seriousness of the offense," a factor applicable to ordinary sentencing, but not capital sentencing.

In this post-conviction proceeding, appellant also claims that the trial court considered appellant's parole status at the time of his crimes and his criminal history as aggravating circumstances, contrary to the death sentence statute.

The statutory menu of aggravating circumstances applicable in non-capital felony sentencing is open-ended. I.C. 35–38–1–7(d). The statutory menu of aggravating circumstances applicable in capital sentencing is now twelve in number (ten in number at time of appellant's crime) and is closed-ended. I.C. 35–50–2–9(b). Only the weight of one or more of those twelve aggravating circumstances, proved to the satisfaction of the sentencing court beyond a reasonable doubt, can be considered by the court when balancing aggravating and mitigating circumstances in arriving at the decision on whether the death sentence should be given. *Minnick v. State* (1989), Ind., 544 N.E.2d 471, 485 (opinion of DeBruler, J., concurring and dissenting in which Dickson, J., concurred).

In its sentencing findings and order, the trial court first completed its application of the death sentencing process, concluding with the statement that "any mitigating circumstances that exist within I.C. 35–50–2–9(c)(7) are outweighed by the aggravating circumstances." This is then followed by three further and unusual concluding paragraphs as follows:

12. In addition to the requirements of I.C. 35–50–2–9 [the death sentence statute], this Court further finds:

A. That Donald Ray Wallace, Jr. has recently violated the conditions of parole:

\*     \*     \*     \*     \*     \*

13. That Donald Ray Wallace, Jr. had a long history of serious criminal conduct:

[Here follows a long list of juvenile court proceedings and three felony convictions for offenses of the theft genre, spanning the years between 1968 and 1979]

11. [sic] The Court finds that not one scintilla of evidence exists on any mitigating circumstances as set forth in I.C. 35–50–1–1 [sic].

I agree with the construction of this order proposed by appellant, namely that the sentencing court utilized these added findings as statutory aggravating circumstances, in a departure from the death sentence stat-

ute, in addition to the departure noted above from my dissenting opinion. These two additional departures entitle appellant to a new sentencing hearing.

If it should be that the purpose of paragraph twelve of the findings and order, with its references to appellant's parole status and to his criminal history, is to demonstrate the trial court's determination that appellant is entitled to no mitigating credit because of the absence in his past of a significant history of prior criminal conduct, a new sentencing hearing is nevertheless constitutionally mandated by the Eighth Amendment. The list in paragraph 12(B) as evidencing a "long history of serious criminal conduct" is made up of multiple juvenile court proceedings and three felony convictions. After appellant was sentenced to death, two of those three felony convictions were set aside. The remaining felony conviction occurred after a waiver of juvenile court jurisdiction when appellant was seventeen years of age. The conviction was for theft of more than $100.00 for which appellant, in 1974, received a sentence of from one to ten years.

In *Johnson v. Mississippi*, 486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988), the defendant was sentenced to death on the basis of three aggravating circumstances, one of which was a prior conviction. After the sentence, that conviction was set aside in the State of New York. The State of Mississippi then denied post-conviction relief on the basis that the New York action had no legal effect on the use of that prior conviction for death sentencing purposes in Mississippi. The United States Supreme Court reversed and ordered a new sentencing hearing. Here, the prior convictions that were set aside after the sentence were, under the last analysis above in this opinion of the sentencing order, used not as an aggravating circumstance, but as grounds for totally discounting appellant's past conduct as a source of mitigating weight. If the Eighth Amendment commands that the determination of aggravating circumstances upon which a death sentence rests be made free of taint of invalid prior convictions, it requires that the determination of mitigating circumstances upon

which a death sentence also rests be made free of the taint of invalid prior convictions, for in either usage there can be no confidence in the reliability and justness of the determination.

For both of the foregoing reasons, I would reverse the judgment of the post-conviction court and order a new death sentencing hearing, or upon agreement by the State, a new felony sentencing hearing for the purpose of setting and imposing sentences of years for the crimes of felony murder. Insofar as the integrity of the convictions is upheld, I concur.

DICKSON, J., concurs.